[No. 26816-1-III.   Division Three.   October 30, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSE LUIS SANCHEZ, JR., *Appellant*.

520

*David L. Donnan, Susan F. Wilk, Gregory C. Link, Elaine L. Winters* (of *Washington Appellate Project*), for appellant.

*James P. Hagarty, Prosecuting Attorney,* and *Kenneth L. Ramm Jr., Deputy,* for respondent.

¶1 SIDDOWAY, A.C.J. — Jose Luis Sanchez Jr. was convicted of two counts of aggravated first degree murder and other crimes for his home invasion robbery of a Yakima drug dealer and execution-style shooting of the family that left two dead and two injured. He makes numerous assignments of error. Key among them are the trial court's disqualification of his original appointed lawyers, its conduct of his trial in a jailhouse courtroom, and its denial of his motion to suppress a victim's challenged in-court eyewitness identification testimony. He also challenges the court's denial of his motion to suppress and denial of motions in limine and other evidentiary objections, alleges violations of his due process and public trial rights, and complains of ineffective assistance of counsel and cumulative error. We find no reversible error or abuse of discretion and affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2 On the night of February 20, 2005, Michelle Kublic left her townhouse apartment to run an errand. Upon backing her Chevrolet Suburban out of its parking spot, she was confronted by a Hispanic man with a gun, later established to be Mario Mendez, who appeared in front of the vehicle, illuminated by her headlights. A second Hispanic man, later established to be the appellant, Jose Luis Sanchez Jr., opened the driver's door, grabbed her by the hair, and pulled her from her vehicle. Holding a gun to her head, he walked her back to the apartment where she lived with Ricky Causor, a drug dealer, and their two daughters. He told her to tell Causor to open the door. When Causor

opened the door, the man holding her hostage pointed his gun at Causor. She noticed the gun was square-shaped with its ammunition clip inserted from the bottom. She tried to wrestle the gun away, but Causor said to stop, they were going to "give them what they want." Report of Proceedings (RP) (Nov. 15, 2007) at 1014. He let the man enter. Once inside, the gunman forced Kublic to kneel on the floor with her and Causor's 3-year-old and 18-month-old daughters.

¶3 The man she had first seen in her headlights (Mendez) soon entered the apartment, now wearing a mask. He carried a revolver-style handgun and guarded her in the living room while the unmasked intruder took Causor into the kitchen to gather marijuana and money. After Causor retrieved all of his marijuana and approximately $900 in currency, the unmasked intruder escorted him back to the living room and Causor knelt down facing Kublic. Their daughters were on the floor between them. The unmasked intruder's last act before leaving the apartment was to fire five shots from his .45 caliber handgun at the heads of Causor and Kublic, at close range. Causor was struck by three shots, two of which passed through his body into the 3-year-old; both died almost immediately. The unmasked intruder's remaining shots wounded Kublic, who was hospitalized for a week with gunshot wounds to her neck, jaw, scapula, lung, and chest. The shots also injured the 18-month-old.

¶4 Officer David Cortez of the Yakima Police Department attempted to interview Kublic in the hospital intensive care unit the following morning. She was medicated, was in obvious pain, appeared tired, and was slow to give answers. She told him the attackers were two Mexican men whom she believed arrived in an older, full-size, light-blue pickup truck that she noticed when walking out to her car the prior evening. Although Kublic would later describe the two gunmen and their roles differently, Officer Cortez's notes indicate that she told him the first had a wide nose and a lighter complexion and bigger build than the second, and that he wore a mask. She said the second gunman did

not wear a mask; had a "sucked in" face; was thinner than the first; was small (she estimated about 5 feet 4 inches or 5 feet 5 inches tall); and was dingy looking with uncombed, matted hair. RP (Nov. 29, 2007) at 2036. She said the second had forced her from her vehicle and made her walk back to her apartment with a semiautomatic pistol to her head. He was the one who later shot Causor. She said Causor had taken the first gunman to another part of the apartment to give him what he wanted while she and the children stayed with the second.

¶5 The next morning, February 22, Detective David Kellett, the lead investigator for the department, visited Kublic in the hospital, hoping with her assistance to create composite images of the gunmen. Kublic looked sleepy and under the influence of medication but was able to participate for about 45 minutes until pain and discomfort made her too tired to continue. In providing descriptions to the detective, Kublic initially did not differentiate between the two gunmen except to state that one wore a mask and one did not. She told the detective she did not get as good a look at the one with the mask but remembered well the face of the person who wore no mask.

¶6 Detective Kellett then enlisted her assistance in preparing a computer-generated composite of the gunman she remembered best. Kublic described him as thin and gaunt, with long and unkempt straight hair, a thin or short mustache, and a dark Hispanic complexion. Detective Kellett never asked her whether he, or the other, was the shooter. When she reached a point at which she was in too much pain to continue, she told him that the depiction was good so far but that the cheeks needed to be more hollow, the chin different, and the hair longer.

¶7 On the night of February 22, Officer Cortez returned to the hospital and showed Kublic a photomontage. Before allowing Kublic to view this and later photo arrays, he admonished her that she was not required or expected to choose anyone but just to pick the person who did the crime,

and that the purpose of the review is not only to arrest offenders but to clear the innocent. The photo array presented by Cortez happened to include Jose Luis Sanchez Jr., but only as a filler photo because he was not yet a suspect. Kublic did not identify him or anyone else from the array.

¶8 On February 23, police officers received two anonymous telephone tips that Jose Sanchez, or "Junior" Sanchez, a name by which he was commonly known, was responsible for the Causor murder. The second caller said that Junior[1] could be found at 303 South Ninth Street. The Ninth Street address was the home of Luz Carrillo; her husband, Albert Vasquez; and Luz Carrillo's three children. The oldest of Carrillo's children, Roberta,[2] then age 15, was the girl friend of Junior Sanchez and was pregnant with his child in February 2005. The house was described by witnesses as a "drug house," known to be a place where acquaintances of the Vasquez/Carrillo family could drop in to smoke marijuana or crystal methamphetamine. Among those identified by witnesses as regulars at the Ninth Street house were Junior's older brother, Manuel "Puppet" Sanchez, and his younger brother, Rene Sanchez. In February 2005, Junior was living with Roberta at the Ninth Street house.

¶9 Acting on the tips, officers set up surveillance and eventually stopped a Toyota Celica that left the house with Ramon Marmelejo driving and Junior in the passenger seat. Both were handcuffed and transported to the police station. While in a holding cell, Junior was captured by a surveillance camera pulling currency from his pocket (as best he could while handcuffed) and attempting to eat it.

¶10 Back at the Ninth Street house, a frightened Albert Vasquez spontaneously had told an officer that his family

---

[1] Jose Luis Sanchez Jr. has two brothers who participated in planning the robbery, as discussed hereafter. To avoid confusion, we refer to him in discussing the facts as "Junior" or "Junior Sanchez," and elsewhere as "Sanchez." Last names will ordinarily be used for other individuals.

[2] Roberta was also known as Christina. We use "Roberta" throughout because that name is used in the trial court's rulings.

needed protection because "the people who killed the little girl" had been at his house. RP (Nov. 19, 2007) at 1368. He also told the officer that they left clothing inside. Officers obtained a search warrant for the house and seized the clothing worn by Junior on the day of the crime. They also found and seized a .45 Kimber handgun hidden within a couch, which proved in later ballistics testing to be the gun from which all the shell casings and bullets recovered from the murder scene were fired.

¶11 Detective Kellett returned to the hospital again late on the night of February 23 to present Kublic with a binder including a 20-page serial array of individual photographs. Among them were photographs of Junior Sanchez, Mario Mendez, and Manuel Sanchez. The detective did not tell her that Junior Sanchez had been arrested. Kublic appeared more alert. Detective Kellett positioned himself beside her and turned the pages, pausing about three seconds with each page. Upon seeing Mendez's photo, Kublic gasped and said, "[T]hat looks like him." RP (Nov. 29, 2007) at 2079. She did not react in any way upon seeing the photographs of Junior Sanchez or Manuel Sanchez. After reviewing all of the photographs, Kublic took the book from the detective's hands, turned back to the photo of Mendez and expressed assurance that he was "the one without the mask." *Id.*

¶12 On February 28, Mendez and Sanchez were charged as codefendants with several crimes including aggravated first degree murder, which carried a possible death penalty.

¶13 On March 2, several days after Kublic was released from the hospital, she met with Detective Kellett to provide a tape-recorded statement. By that time, Junior's booking photo had appeared in the newspaper and on local television news. In the course of Kublic's recorded statement, she stated that she now thought the suspect she had earlier described as having very short hair might have been the one with the automatic gun. She also stated that she had thought he had hair, "but after I saw him on the news, he's the one with the shaved head, the one that they have." *Id.* at

2086. Detective Kellett's understanding was that Kublic had been sure on February 23 that Mendez was the one without the mask, but on March 2 was now sure that "the one that they have" (Junior) was the one without the mask.

¶14 Mendez became aware within days that he was a suspect. After lying low in Yakima for six weeks, he fled to Mexico in April. He was apprehended attempting to reenter the United States in October 2005. He would later testify that he had learned Junior was accusing him of being the shooter and was sure that police would find his cell phone, which he had dropped during the crime.[3] Knowing he would be caught eventually, he decided to return to Washington to face the charges.

¶15 By the time Mendez was arrested at the border, Jacqueline Walsh and Steven Witchley had been appointed to represent Sanchez. Their appointment was delayed due in part to a conflict of interest that prevented the Yakima County Department of Assigned Counsel (DAC) from representing either Junior or Mendez. When DAC director L. Daniel Fessler learned of Mendez's California arrest on October 25, he began to look for qualified counsel outside his office to represent Mendez. On November 7, a Yakima County judge signed an order authorizing counsel for Mendez at public expense. On November 9, Mendez's illegal immigration charges were dismissed and he was transferred to the Yakima County jail. Mendez appeared for arraignment on November 17. Counsel was appointed for him on November 18.

¶16 By this time, however, Junior's lawyers had already interviewed Mendez three times. Upon being apprehended at the border, Mendez was initially held in a corrections center in San Diego. Attorney Norma Aguilar was appointed to represent him in connection with an immigration charge. She and representatives of the Mexican Consulate

---

[3] Police had indeed found his cell phone; he had dropped it in Kublic's Suburban, near the driver's seat.

told Mendez not to discuss the Yakima County criminal charges pending against him with anyone but the lawyers who would be appointed to represent him in that case.

¶17 Nonetheless, on November 3, Mendez spoke with Witchley and his investigator, Larry Freeman, who had traveled to the detention center in San Diego to interview Mendez about the Yakima crimes. Witchley and Freeman interviewed Mendez about the Yakima charges a second time in San Diego on November 4. During both meetings, Freeman took notes and prepared detailed interview summaries. On November 16, after Mendez's transfer to Yakima but before he had been arraigned or been appointed counsel, Witchley and Freeman visited Mendez a third time, this time in the jail, again questioning him about the pending charges. Freeman again took notes and prepared an interview summary.

¶18 The interviews would give rise to a motion to disqualify Witchley and Walsh. An additional basis for the motion was that in December 2005, Roberta Carrillo; her younger sister, AC, then age 15; and her younger brother, RC, then age 12, were flown at Witchley's and Walsh's expense to Stockton, California, to live with their father, Ramiro Carrillo Sr., without the permission of their mother. Carrillo was the children's legal custodian even though they had been living with their mother in Yakima. Witchley and Walsh later asserted that they moved the children solely for humanitarian reasons because they were living in squalor and dangerous conditions in Yakima. They never sought reimbursement of the children's airfare. Before flying the children out of state, Witchley and Walsh did not contact Child Protective Services or other agencies that could have helped the children, nor did they inform the police or prosecutor that they were sending the children away from Yakima.

¶19 In early January 2006, Detective Kellett and Detective Uriel Mendoza learned that the Carrillo children were in California and flew there to locate them and obtain

statements about what they knew about the crimes. Two of the children had personal knowledge of material information inculpating Junior. RC had earlier told police that Junior Sanchez was carrying the .45 caliber murder weapon on the day of the murders. Roberta had earlier admitted seeing Junior return to the Ninth Street house with the murder weapon the night of February 20 and being given the gun for safekeeping by Junior the following day.

¶20  In September 2006, Mendez's lawyers filed a motion for sanctions against Witchley and Walsh for alleged violations of the Rules of Professional Conduct, including lawyer-witness conflict, stemming from their contact with Mendez and their arranging for the Carrillo children to leave the state. They asked that the two lawyers be disqualified as Junior's counsel, as well as for other sanctions.

¶21  The State did not join in Mendez's motion for sanctions but advised the court in a response pleading that it had concerns about the allegations of the defense lawyers' conduct. It informed the court that it might investigate criminal charges against Witchley and Walsh for witness tampering and intimidating a public servant.

¶22  The court conducted a hearing on the sanctions motion on November 17, 2006. It concluded that Mendez's motion and the State's response raised sufficiently serious prospects of future lawyer-witness and conflict problems that disqualification of Witchley and Walsh was necessary. A motion for reconsideration of the disqualification decision was denied.

¶23  New lawyers were appointed for Sanchez by no later than February 8, 2007. To accommodate the new defense lawyers, trial was continued from April to November 2007.

¶24  In August 2007, Sanchez moved to suppress Kublic's eyewitness identification of him as induced by impermissibly suggestive police procedures likely to lead to misidentification. He argued that her identification was too unreliable to be submitted to the jury. Kublic would eventually

testify that her initial confusion about whether the shooter had been the man with or without the mask passed as she recovered from the trauma of the shooting, and that she was 100 percent sure that Sanchez was the gunman. She would testify at trial that just before he began shooting, she "saw his face clear as day, mad and pointing the gun." RP (Nov. 15, 2007) at 1037. The court denied the suppression motion, concluding that Kublic's in-court identification would appropriately be tested on cross-examination and its reliability was a matter for the jury to decide.

¶25 In September 2007, Mendez pleaded guilty to murder, burglary, robbery, and assault charges in exchange for truthful trial testimony and a recommended 30-year sentence.

¶26 In October 2007, Sanchez filed a motion objecting to the court's scheduling of his trial in a courtroom in the Yakima County jail, rather than in the county courthouse. His motion to hold trial in the county courthouse was considered by the trial court at an evidentiary hearing in late October and denied.

¶27 A four-and-a-half-week trial began on November 5, 2007. Among the witnesses at trial were Mendez and Carlos Orozco Jr., both regulars at the Ninth Street house. They testified to having been present for discussions of a plan to rob Ricky Causor, who was believed to have a great deal of cash from selling marijuana and to be an easy target because he had not retaliated for a past robbery. The discussions included Junior, Mendez, Orozco, Ramon Marmelejo, Filiberto "Ben Davis" Montes, and Junior's brothers Manuel and Rene.

¶28 Mendez testified that on the morning of the crime, he traveled to the Ninth Street house to further discuss the robbery with Orozco and Junior. Mendez, Junior, and Rene decided to delay the robbery until later that evening. Early in the evening, Mendez and Junior left in Junior's blue pickup to buy beer and on the way dropped Mendez's car off at the apartment of Junior's second girl friend, Sarah Day. According to Mendez, Junior did not go inside the Day

apartment. Mendez recalled there were three guns in Junior's truck at that time—Mendez's .38, Junior's .45, and a 9 mm for Rene—as well as ski masks that Mendez had prepared to serve as disguises. After buying beer, Junior decided they should drive by Causor's apartment to check it out. He parked in a tight spot on a far end of the apartment's parking lot.

¶29 While Mendez and Junior sat in the truck drinking a beer, Kublic emerged from her apartment and entered her Suburban. According to Mendez, Junior said, "[T]his is the time" and both men jumped out of the truck and positioned themselves to block the Suburban when Kublic completed backing out of her parking spot. RP (Nov. 26, 2007) at 1686. They wore hoods over their heads but no masks; Junior earlier told Mendez he would not wear a mask and never did. Mendez testified that Junior pulled Kublic from the vehicle, pointed a gun at her head, and threatened to kill her if she ran. Junior told Mendez to park the Suburban, which Mendez did, at the end of the parking lot. Mendez then hurried to Junior's truck, put on a mask, and joined Junior inside the apartment.

¶30 Kublic was by then kneeling on the living room floor, holding her girls. Causor emerged from the kitchen carrying bags of marijuana as Junior held a gun to his head. Causor set four bags of marijuana on a coffee table and pulled money from his pocket and threw it on the floor. Mendez and Junior each picked up a couple of bags of marijuana and stuffed currency in their pockets. Thinking everything was done, Mendez started to leave. But Junior then stepped behind Causor, who by then was kneeling on the floor, hugging Kublic. Junior shot Causor in the back of the head. Junior fired several shots at Kublic as Mendez fled outside.

¶31 Mendez ran for the Suburban but had misplaced the keys. He noticed a car that had apparently just pulled into the parking lot and had its headlights on, pointed in the direction of the Suburban. Mendez tried to hide behind the

Suburban, certain that whoever was in the car could see him. Meanwhile, Junior had left the apartment and was making his escape in the truck. Upon hearing the truck and seeing it approach, Mendez stepped out and Junior stopped, allowing Mendez to jump in.

¶32 Mendez testified that they drove to Junior's uncle's house in Toppenish. Mendez soon realized that he had dropped his cell phone and wanted to go back, but Junior refused. At Junior's uncle's house they divided the marijuana and the cash. Junior traded his share of the marijuana to his uncle for "ice" (methamphetamine). Junior also tried to return the .45 to his uncle, to whom it actually belonged, but according to Mendez, the uncle—who had been told that the robbery "went wrong" and people had been killed—did not want it. *Id.* at 1701. According to Mendez, the uncle told Junior, "Sell it or get rid of it. Don't get caught with it because you're going to get booked." *Id.* at 1704. Upon leaving the uncle's home, Junior dropped Mendez off at his house in Toppenish.

¶33 Carlos Orozco testified that Junior had pressed the others to commit the robbery and invited him to participate. He ultimately withdrew from the robbery plan for fear that Causor, from whom he regularly bought drugs, would recognize him. He testified that he was at the Ninth Street house on the evening of February 20 and learned about the shooting after the fact that night, from someone who saw it on the news. He and Ramon Marmelejo, who was also present at the Ninth Street house, drove by the Causor apartment to see what was going on and saw police cars and ambulances; Orozco noticed on leaving the Ninth Street house that Junior's blue pickup was gone. Orozco testified that when Junior returned to the Ninth Street house a couple of hours later, he was carrying a bag of "ice" in addition to some snacks. The next day, Orozco accompanied Junior and Roberta on a meth-selling trip to Wenatchee. According to Orozco, Junior still had his .45 handgun with him.

¶34 Roberta Carrillo offered testimony that was largely supportive of Junior. Junior's defense theory proposed that Manuel—who had been driven to Mexico by his sister in 2005 after she learned that Yakima police were looking for him and whose whereabouts were unknown—was the shooter, and Roberta testified that Manuel was an enthusiastic participant in plans for the robbery. She offered less helpful testimony as well, testifying that she and Junior owned two guns that they carried—a "nine" and a ".45"— although she testified that Orozco had access to the .45. *Id.* at 1631. She also testified that she and Junior spent the night of February 21 at a motel at his suggestion and that he allowed her at about that time to give his .45 handgun to her parents for protection.

¶35 The State presented other witnesses who supported the fact that Junior owned and carried the Kimber .45 handgun used in the murders. It called the security guard that Mendez and Junior encountered in the apartment parking lot shortly before the murders, who testified to speaking briefly with two Hispanic males on the night of February 20 and described the older, full-size, two-tone blue pickup truck in which they were parked. The State called the visitor to the apartment complex whose headlights were shining in the direction of the Suburban when Mendez fled the apartment; she testified that she was frightened at seeing an apparent robber, carrying a gun and bag and wearing what appeared to be a bandana on his face, who she then saw picked up and driven from the parking lot in a large, old, blue pickup.

¶36 For its part, the defense characterized this as "a classic case[ ] of misidentification." RP (Nov. 13, 2007) at 758. It presented evidence that Junior was at the home of his second girl friend, Sarah Day, at the time of the crime. It vigorously challenged the reliability of Kublic's eyewitness identification by cross-examination and through the testimony of its expert, Dr. Robert Shomer. It pointed to the absence of any forensic evidence tying Junior to the crime

scene despite the fact that the State recovered the clothing he was wearing on the night of the robbery; it presented the testimony of a defense expert that given the close range at which the family members were shot, there should have been traces of blood spatter on the shooter's clothing. It presented evidence raising doubt that Junior's truck could have been the vehicle that moved in and out of the small, tight parking lot to the apartment given problems with its power steering and the noise created by its glass-packed mufflers—noise that no witness had noted. It presented evidence that Junior allowed others access to the .45 and to his blue pickup. It maintained that someone else—most likely Manuel—was the actual killer. It argued that Junior was falsely accused by Mendez, who stood only to gain from his guilty plea and testimony against Junior.

¶37 The jury rejected the defense theory and found Junior Sanchez guilty as charged on all counts, all while armed with a firearm. In a bench trial that followed, he was found guilty of first degree unlawful possession of a firearm. He appeals, making the 13 assignments of error that we now address.

## ANALYSIS

### I. Disqualification of Counsel

¶38 We first consider Sanchez's contention that the trial court erred in disqualifying attorneys Witchley and Walsh as his lawyers. The court's decision was based on its conclusion that there were three problems with Witchley's and Walsh's continued representation of Sanchez.

¶39 One arose from Witchley's participation in the Mendez interviews. If Witchley could impeach later inconsistent statements by Mendez as a result of personal knowledge gained from the interviews, it would raise a potential for conflict and jury confusion. The problem would arise, in the court's view, whether Witchley became a rebuttal witness to

Mendez at trial or the equivalent of an unsworn witness should he cross-examine Mendez or challenge Mendez's testimony in closing argument.

¶40 A second problem arose from Witchley's and Walsh's removal of the Carrillo children from the jurisdiction and Mendez's notice that he intended to rely on the lawyers' involvement in the children's removal as evidence of Sanchez's consciousness of guilt. Mendez represented that he would call Witchley and Walsh as trial witnesses to testify concerning their role in sending the children to California.

¶41 A third problem was raised by the prospect that the State would bring criminal charges against Witchley and Walsh for witness tampering. This raised the specter of their future disqualification for conflict of interest, even if Sanchez waived any conflict.[4]

¶42 The court ultimately reasoned:

> If the only issue was the Mendez interviews, then perhaps the Court could wait until it became clear that Witchley was a necessary witness or the parties could somehow "finesse" the issue by some pre-trial order or give appropriate jury instructions that would guide the jury to avoid confusion about the dual role he has as both advocate and witness. But compounding that problem with the issue of the Carrillo children and the possibility that criminal charges against counsel may be investigated makes it simply too clear that immediate disqualification is required in this case.

Clerk's Papers (CP) at 873.

---

[4] Mendez raised other charges and complaints in support of his motion that were rejected by the court. The court rejected the contention that Witchley and Walsh violated RPC 4.2 (communicating with a person represented by counsel in the matter) by interviewing Mendez at a time when Mendez was not yet represented on the Yakima charge. It also rejected the contention that Walsh violated RPC 4.4(a) in attempting to dissuade DAC director Fessler from filing a protective notice of appearance for Mendez. The court found that Witchley and Walsh violated RPC 1.8(e) (lawyer shall not, while representing client in connection with contemplated or pending litigation, advance or guarantee financial assistance to his or her client) for paying the children's airfare. But that finding, whether or not correct, is extraneous to the finding of lawyer-witness conflict upon which the court based its decision. We address only the three issues that were the basis for the court's disqualification decision.

¶43 Sanchez argues that the court's concerns were an insufficient basis on which to deprive him of an asserted Sixth Amendment right to counsel of his choice and, even if not an error of constitutional dimensions, the court's decision was an abuse of its discretion. We first address his contention that he enjoyed a constitutional right to counsel of his choice.

## A. Sixth and Fourteenth Amendment Rights

¶44 "The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause," which provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' " *Strickland v. Washington*, 466 U.S. 668, 684-85, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (quoting U.S. CONST. amend VI). The United States Supreme Court has found the counsel clause to have two distinct elements: "the right to the effective assistance of counsel" and "[t]he right to select counsel of one's choice." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146-48, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006). Indigent defendants who require court-appointed counsel enjoy the first element: the right to the effective assistance of counsel. *Strickland*, 466 U.S. at 685-86.

¶45 The second—the right to counsel of choice—was formulated in *Wheat v. United States*, 486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988), which also discussed some of its limitations. *Gonzalez-Lopez*, 548 U.S. at 148 n.3. Among those limitations are that "a defendant may not insist on representation by an attorney he cannot afford." *Wheat*, 486 U.S. at 159. In *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 109 S. Ct. 2646, 109 S. Ct. 2667, 105 L. Ed. 2d 528 (1989), the Court observed that

[p]etitioner does not, nor could it defensibly do so, assert that impecunious defendants have a Sixth Amendment right to

choose their counsel. The Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.

"Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of . . . counsel.' " *Id.* at 626 (alteration in original) (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 370, 105 S. Ct. 3180, 87 L. Ed. 2d 220 (1985) (Stevens, J., dissenting)).

¶46 Sanchez cites the Supreme Court's more recent decision in *Gonzalez-Lopez* at length for its discussion of the importance of counsel of choice. But *Gonzalez-Lopez* does not question the Court's earlier limitation of the right to retained counsel. The Court's opinion in *Gonzalez-Lopez* characterizes the counsel of choice element of the Sixth Amendment right as "the right *of a defendant who does not require appointed counsel* to choose who will represent him," 548 U.S. at 144 (emphasis added), and elsewhere affirms that "[a]s the dissent too discusses, the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id.* at 151 (citation omitted).

¶47 Sanchez relies on Justice Brennan's concurring opinion in *Morris v. Slappy*, 461 U.S. 1, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983) as support for his entitlement to counsel of his choice, but we do not find it supportive. To begin with, the opinion of the Court in *Morris* rejected the Court of Appeals' conclusion that the Sixth Amendment right to counsel included the right to a " 'meaningful' " attorney-client relationship, stating that the Court of Appeals' extension of the Sixth Amendment right was "without basis in law." 461 U.S. at 13 (emphasis omitted) (quoting *Slappy v. Morris*, 649 F.2d 718, 720 (9th Cir. 1981)). *Morris*

dealt with the trial court's substitution of a new lawyer for an indigent defendant's original counsel not for conflict reasons, but solely to avoid a delay in trial; even in that context, the Court held that trial courts require a "great deal of latitude" in scheduling trials and enjoy "broad discretion" to substitute counsel for an indigent defendant if necessary to avoid a continuance. *Id.* at 11. And Justice Brennan, joined by Justice Marshall, would have recognized a defendant's "qualified right" only in the event of a trial continuance to have the trial judge "inquire into the expected length of the attorney's unavailability and to determine whether the existing attorney-client relationship can be preserved consistent with society's interests." *Id.* at 25 (Brennan, J., concurring in the result).

¶48 Sanchez argues that his right to equal protection under the Fourteenth Amendment requires us to recognize his equal right to counsel of his choice regardless of ability to pay. But his contention flies in the face of the earlier-cited and controlling decisions of the United States Supreme Court. While those cases do not analyze the right to counsel of choice as a property or contract right, they treat it somewhat similarly: they treat a defendant's relationship with retained counsel as one that a defendant is not demanding that the State create, but that the defendant has independently secured. They treat this independently created relationship as one that has constitutionally recognized value and is something with which the government generally shall not interfere. Indigent defendants are not denied equal protection of the right to counsel of choice; they simply do not have the independent relationship with retained counsel that is protected by this element of the counsel clause. The United States Supreme Court's precedents control our application of federal constitutional rights; we may not substitute a different and broader interpretation of our own. *See Arkansas v. Sullivan*, 532 U.S. 769, 772, 121 S. Ct. 1876, 149 L. Ed. 2d 994 (2001).

¶49 The Sixth Amendment right to choice of retained counsel was therefore not at issue in the disqualification

motion. While the trial court's authority to disqualify Walsh and Witchley was subject to Sanchez's Sixth Amendment right to effective assistance of counsel, no one contends that the lawyers appointed to replace Walsh and Witchley did not provide effective representation. At a February 23, 2007 status hearing, Sanchez told the court he was comfortable with his new lawyers, Peter Mazzone and Jesse Cantor. It is clear from the record that they, like Witchley and Walsh before them, provided highly competent representation. Accordingly, we need examine only whether, in disqualifying Walsh and Witchley, the trial court abused its discretion under state law.

## B. State Law Bases for Disqualifying Counsel

### 1. Lawyer-Witness and Unsworn Witness Concerns Arising from Mendez Interviews

¶50 When Sanchez's lawyers became aware that Mendez was in custody and unrepresented, Witchley acted quickly to interview Mendez three times before lawyers were appointed for him and cut off further conversations. The court characterized Witchley's actions in seeking and conducting interviews with Mendez as "aggressive, unusual and controversial" but did not find a disqualifying ethical violation. CP at 862. Mendez was not yet represented in the criminal matter within the ambit of RPC 4.2 when the interviews occurred, and the court recognized Witchley's duty in a potential capital case to conduct a thorough investigation and seek out and interview potential witnesses. *See* AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 79 (rev. ed. 2003) (ABA GUIDELINES). The court ruled that Witchley's interviewing of Mendez did not itself warrant disqualification. But it concluded that the Mendez interviews posed a serious potential for lawyer-witness or lawyer-as-unsworn-witness conflict that weighed in favor of disqualification. Here, we disagree.

¶51 In Washington, a trial court has the authority under the lawyer-witness rule, RPC 3.7,[5] to disqualify even a conflict-free lawyer who is likely to be a necessary witness. *Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co.*, 124 Wn.2d 789, 811-12, 881 P.2d 1020 (1994) (*PUD No. 1*); *and see* CR 43(g) (attorney who gives evidence on the merits "shall not argue the case to the jury, unless by permission of the court"). RPC 3.7 provides in relevant part:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case;

(3) disqualification of the lawyer would work substantial hardship on the client; or

(4) the lawyer has been called by the opposing party and the court rules that the lawyer may continue to act as an advocate.

Even where the lawyer's testimony does not create a conflict with his or her client, "[c]ombining the roles of advocate and witness can prejudice the tribunal and the opposing party." RPC 3.7 cmt. 1.

¶52 A motion for disqualification under RPC 3.7 must be supported by a showing that (1) the attorney will give evidence material to the determination of the issues being litigated, (2) the evidence is unobtainable elsewhere, and (3) the testimony is or may be prejudicial to the testifying attorney's client. *PUD No. 1*, 124 Wn.2d at 812 (adopting the showing required in *Cottonwood Estates, Inc. v. Paradise Builders, Inc.*, 128 Ariz. 99, 105, 624 P.2d 296 (1981)). In a decision that postdates the trial court's November 2006 disqualification of Witchley and Walsh, this court held that a trial court must apply the *PUD No. 1* factors and make appropriate findings concerning the materiality and necessity of counsel's testimony, as well as

---

[5] RPC 3.7 was amended effective September 1, 2006. *See* 157 Wn.2d 1275.

determine any prejudice to the attorney's client, before making the decision to disqualify counsel. *Am. States Ins. Co. ex rel. Kommavongsa v. Nammathao*, 153 Wn. App. 461, 466-67, 220 P.3d 1283 (2009).

¶53 A superior court has the authority and duty to see to the ethical conduct of lawyers in proceedings before it and, upon proper grounds, can disqualify an attorney. *Hahn v. Boeing Co.*, 95 Wn.2d 28, 34, 621 P.2d 1263 (1980). A lawyer may be disqualified as an advocate at trial where he or she is likely to be a necessary witness. *PUD No. 1*, 124 Wn.2d at 811-12; *see* RPC 3.7; CR 43(g). A trial court's ruling disqualifying counsel who is likely to be a necessary witness is reviewed for abuse of discretion. *PUD No. 1*, 124 Wn.2d at 812. Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State v. Schmitt*, 124 Wn. App. 662, 666, 102 P.3d 856 (2004). Discretion also is abused when it is exercised contrary to law. *State v. Tobin*, 161 Wn.2d 517, 523, 166 P.3d 1167 (2007).

¶54 Witchley's three interviews of Mendez created a prospect that Witchley would have personal knowledge of impeaching matter should Mendez testify inconsistently at trial. But Witchley had his investigator, Freeman, join him for his interviews of Mendez, and Freeman was available to testify should it be necessary to impeach Mendez at trial with statements made during the interview. To avoid lawyer-witness problems, it is typical and advisable for lawyers to conduct witness interviews in this manner, so that a third person can be called as an impeachment witness if the interviewee testifies inconsistently at trial. *See* ABA GUIDE-LINES at 79; ABA STANDARDS FOR CRIMINAL JUSTICE std. 4-4.3(e) at 185 (3d ed. 1993); *United States v. Watson*, 87 F.3d 927, 932 (7th Cir. 1996) (lawyer-witness rule did not bar prosecutor who interviewed defendant from representing government when interview was conducted in presence of third person available to testify as to government's version of conversation). It was speculative whether impeachment testimony based on the Mendez interviews would be pre-

sented at all, but because any testimony Witchley could provide could also be provided by Freeman, Mendez did not demonstrate the second *PUD No. 1* factor: that the evidence was unobtainable elsewhere.

¶55 The trial court also considered whether the prospect of Witchley taking on an "unsworn witness" role presented a different and serious potential for conflict. The unsworn witness problem is addressed in *Gonzalez v. State*, 117 S.W.3d 831 (Tex. Crim. App. 2003), a decision that proved persuasive to the trial court. The State urges us to accept its reasoning as a separate and sufficient basis for disqualification.

¶56 In *Gonzalez*, as here, the challenged defense lawyer spoke on several occasions with a codefendant who later became the principal witness against his client. At the hearing on the motion to disqualify counsel, the lawyer whose representation was at issue twice interjected personal knowledge gained from his conversations with the codefendant and other witnesses. Although not a witness, he commented once that the codefendant's answer was " 'absolutely correct.' " *Id.* at 836. He challenged another witness's testimony by asking, " 'Would it surprise you that I have never met with you?' " *Id.* Evidently anticipating that the lawyer would have the same problem interjecting personal knowledge into proceedings at trial, the court in *Gonzalez* ordered him disqualified, concerned that jurors would regard him as an unsworn witness. The court explained:

> [E]ven if attorney Gonzalez[6] did not testify, but referred to his own recollection of the events through cross-examination, the State would have been prejudiced by the implication to the jury that his questions represented the truth based on his personal knowledge of what had occurred. The State would have been prejudiced by the inability to clarify counsel's testimony and impeach counsel's credibility. Counsel's personal knowledge regarding the conversations with the State's witness would have affected the jury's perspective, not only on the witness

---

[6] The challenged attorney, like his client, had the surname Gonzalez (as, for that matter, did the State's key witness).

tampering issue, but also on the credibility of the State's key witness against appellant regarding the facts of the charged crime. Therefore, the confusion resulting from counsel's dual roles would most likely have substantially affected the jury's verdict. If the confusion were such that it would have prevented an impartial verdict from being reached, it could have resulted in a mistrial.

*Id.* at 840. The court rejected the proposition that any problem could be solved by having someone other than a challenged defense lawyer testify to a lawyer-codefendant conversation because "even if someone other than counsel testified to the conversation, counsel would still be placed before the jury in the dual roles of both advocate and unsworn witness, with personal knowledge of disputed facts." *Id.* at 841-42.

¶57 Here, the trial court found that Witchley, like the lawyer whose representation was at issue in *Gonzalez*, interjected his personal knowledge gained through the Mendez interviews in the sanctions hearing by arguing that Mendez had perjured himself in his declaration relating to the interviews.[7] Citing to the holdings in *Gonzalez* set forth above, the trial court stated:

> One of the concerns that the Court has is whether there would be jury confusion about Witchley's dual role as both advocate and witness. Another concern is how Witchley would avoid commenting on Mendez' credibility as an "unsworn witness" in cross examination or in argument to the jury or as an <u>actual</u> witness if called to testify?

CP at 862-63. The court later observed:

> Witchley has already alluded in the Sanchez brief that he believes that Mendez has perjured himself in his declaration. Should Mendez testify, would Witchley, even if he does not

---

[7] His brief in opposition to the motion stated, "Mendez's own declaration is, to put it frankly, perjured." CP at 877. In oral argument, Witchley stated, "[Mr. Mendez] knows that many of the things in the declaration that his lawyers wrote for him presumably and that he signed, he knows those statements are false." RP (Nov. 17, 2006) at 68.

himself testify, be able to cross examine Mendez without referring to his own recollection of the meetings? Would the State not be prejudiced by the implication to the jury that Witchley's questions represented the truth based on his personal knowledge of what had occurred?

CP at 868.

¶58 No Washington decision has addressed whether the prospect that a lawyer might conduct himself or herself as an unsworn witness at trial is a basis for disqualification. *Gonzalez* relied for authority on cases from the Second Circuit Court of Appeals. We do not disagree with the holdings of those cases that the problems presented by a lawyer as unsworn witness can be even more problematic than the problems created where a lawyer is a sworn witness; as the Second Circuit has observed, where a lawyer who the jury learns has personal knowledge implicitly communicates that knowledge through cross-examination or argument, the interest sought to be protected by disciplinary rules is " 'even more seriously eroded than if [defense counsel] appeared as a sworn witness' " because " 'an unsworn witness [is not] subject to cross-examination or explicit impeachment.' " *United States v. Kwang Fu Peng*, 766 F.2d 82, 86 (2d Cir. 1985) (first alteration in original) (quoting *United States v. Cunningham*, 672 F.2d 1064, 1075 (2d Cir. 1982)).

¶59 Nevertheless, we are unwilling to treat the prospect that a lawyer might conduct himself as an unsworn witness as a separate basis for disqualification. Lawyers are not permitted to impart to the jury personal knowledge about an issue in the case under the guise of either direct or cross-examination when such information is not otherwise admissible in evidence. *State v. Denton*, 58 Wn. App. 251, 257, 792 P.2d 537 (1990) (citing *State v. Yoakum*, 37 Wn.2d 137, 222 P.2d 181 (1950)). Improper implicit testimony by a lawyer can be prevented by pretrial motion and order or by timely objection. Witchley could have been required to impartially phrase his questions on any cross-examination

of Mendez so as to avoid " 'subliminal' " testimony or " 'vouch[ing]' " for Freeman's credibility. *United States v. Marshall*, 75 F.3d 1097, 1106 & n.3 (7th Cir. 1996) (prosecutor did not accuse defendant of lying about meeting both had attended but simply contrasted defendant's testimony with that of the Federal Bureau of Investigation agent who had testified about the meeting for the State). In this instance, we agree with Sanchez—to rely on Witchley's participation in the interview alone as a sufficient basis for disqualification would discourage defense lawyers and prosecutors alike from participating in important interviews by creating an unwarranted presumption that they would use knowledge gained to engage in trial misconduct.

¶60 Even the trial court here recognized that if the only issue was the Mendez interviews, "then perhaps the Court could wait until it became clear that Witchley was a necessary witness or the parties could somehow 'finesse' the issue by some pre-trial order." CP at 873. We conclude that it was legal error, and thereby an abuse of discretion, to adopt the reasoning of *Gonzalez* that participation in witness interviews is a sufficient basis for disqualification.

### 2. Lawyer-Witness and Conflict of Interest Concerns Arising from Movement of the Carrillo Children

¶61 Whether a sufficient basis for disqualification existed in light of potential problems arising from Witchley's and Walsh's role in transporting the Carrillo children out of state presents a question of first impression in Washington. We conclude that it presented the prospect of a future problem.

¶62 Two of the Carrillo children, Roberta and RC, were material child witnesses with evidence adverse to Sanchez. While Witchley and Walsh insisted that they arranged for the children to travel to California for humanitarian reasons—which may be so—Mendez's lawyers had announced their intention to call Witchley and Walsh for purposes of

establishing that the children's move showed consciousness of guilt. Sanchez now characterizes Mendez's insistence on presenting evidence of the lawyers' removal of the Carrillo children as retaliatory. But the record suggests that the Mendez lawyers were simply defending their client as zealously as were the Sanchez lawyers in this potentially capital case. And Mendez's lawyer's insistence on his right to present the children's removal as evidence was emphatic. At the hearing on the sanctions motion, he argued, in part:

> [R]egardless of how the court rules you can be . . . sure that we're going after what we believe is the undue influence, intentional influencing of witnesses, which we regard as witness tampering. So don't—let's not mince it. We definitely believe these people tampered with witnesses . . . . I'm putting them on notice it's an issue of trial regardless of . . . how the court rules.

RP (Nov. 17, 2006) at 87-88.

¶63 Sanchez downplays the significance of his lawyers' actions because the children's location was not kept secret from Mendez or the prosecutor and detectives were able to locate and interview the children in California. But Mendez and the State did not agree that there had been no interference. Mendez's lawyers claimed that they had encountered difficulty locating the children. RP (Nov. 17, 2006) at 49-50. The State argues that for a period of time the children's whereabouts were unknown to law enforcement. Br. of Resp't at 16. Even Witchley acknowledged during the sanctions hearing that his and Walsh's spending their own money for airfare to move material witnesses out of the jurisdiction without notice may "look bad," particularly when they ignored other avenues such as contacting child welfare agencies. RP (Nov. 17, 2006) at 73-74.

¶64 "A party's fraud or misconduct in the preparation or prosecution of a case is relevant to show guilt or the party's lack of belief in his or her cause. Relevant misconduct includes . . . efforts to prevent witnesses from testifying . . . and efforts to suppress evidence other than docu-

ments." 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 402.7, at 293-94 (5th ed. 2007). Among efforts to prevent witnesses from testifying that can be presented as evidence are efforts to absent material witnesses from the jurisdiction.

■ ¶65 In *State v. Kosanke*, 23 Wn.2d 211, 160 P.2d 541 (1945), the court held that the State presented sufficient foundation to permit evidence of a conversation in which the defendant's wife allegedly tried to persuade the parents of a child victim to move out of state where they would be immune from subpoena. The court explained:

> Conduct on the part of an accused person, or that of someone acting in his behalf at his request or with his knowledge and consent, having for its purpose the prevention of witnesses appearing and testifying at his trial, is a circumstance for the jury to consider as not being likely to be the conduct of one who was conscious of his innocence, or that his cause lacks truth and honesty, or as tending to show an indirect admission of guilt; but if the conduct is that of a third person, *before the evidence is admissible* it must be shown that such person was acting at the request of the accused, or that it was with his knowledge and consent.

*Id.* at 215 (emphasis added).

¶66 Sanchez argues that the evidence here did not pass the first hurdle identified by *Kosanke* because there is no evidence that his lawyers "act[ed] at the request of the accused, or . . . with his knowledge and consent." *Id.* The defendant in *Kosanke* likewise argued that the State failed to show that his wife's private conversation with the parents of a child witness was at his request or with his knowledge and consent. But there was circumstantial evidence that he accompanied her to the place where her meeting with the parents took place and that he and his wife thereafter had a conversation, overheard by a witness, from which the jury might infer that he knew of the substance of her meeting. The court held that this was sufficient evidence to admit the third party conduct, with

the jury to decide whether the wife's efforts were at the request of her husband or with his knowledge and consent. *Id.* at 216.

¶67 At the time of the motion to disqualify Witchley and Walsh, the only circumstantial evidence that Mendez could offer to support Sanchez's knowledge or consent was the attorney-client relationship itself, the fact that it would benefit Sanchez if witnesses with inculpatory information were not interviewed, and the peculiar decision of Witchley and Walsh to forgo regular avenues of assistance to the children in favor of intervening personally. No Washington case sheds light on whether evidence of this character is sufficient to make admissible the fraud or misconduct of a third party. What limited authority we find from other jurisdictions supports Sanchez's argument that this limited evidence would not be sufficient. *See Douglas v. State*, 1997 OK Cr 79, 951 P.2d 651, 669 ("the attorney/client relationship, without more, is insufficient to use a third party's efforts to tamper with witnesses as evidence of an accused's guilt"); *cf. State v. Clausen*, 247 Neb. 309, 527 N.W.2d 609, 614 (1995) (it was ineffective assistance for defense counsel to fail to object to evidence that he had attempted to suborn perjury where the inference would be that his client was also culpable, resulting in prejudice sufficient to require reversal). In arriving at its conclusion, the *Douglas* court cites *Saunders v. State*, 28 Md. App. 455, 346 A.2d 448, 451 (1975) for its holding that the fact that a third party and the accused are related has not been held to be adequate proof, by itself, of the necessary authorization.

¶68 There remained the possibility that Mendez or the State might develop evidence of Sanchez's knowledge or involvement in the relocation of the Carrillo children, however. At the time Mendez filed his sanctions motion in September 2006, the record suggests that his lawyers had not yet interviewed the Carrillo children and presumably had other investigation remaining to be done. There was the potential that they, or the State in the course of its

investigation, might speak to witnesses providing direct or circumstantial evidence suggesting Sanchez's knowledge or consent.

¶69 And the fact that it was *Mendez's* stated intention to offer the evidence, rather than the State's, added another wrinkle. Mendez enjoyed the right under both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution to obtain witnesses and present a defense. *State v. Thomas*, 150 Wn.2d 821, 857, 83 P.3d 970 (2004); *State v. Maupin*, 128 Wn.2d 918, 924-25, 913 P.2d 808 (1996); *State v. Hudlow*, 99 Wn.2d 1, 15-16, 659 P.2d 514 (1983). The right to present a complete defense, including a third party culpability defense, does not mean that a defendant may introduce whatever evidence he wishes, but it does mean that state-law evidentiary restrictions that are " 'arbitrary' " or " 'disproportionate to the purposes they are designed to serve' " must yield to a defendant's right to present a defense. *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)), *cert. denied*, 131 S. Ct. 2873 (2011).

¶70 We do not decide whether or how the *Kosanke* threshold might be modified in its application to Mendez, but we recognize it as a real and undecided issue. And we agree with the trial court's conclusion that if that threshold were crossed, disqualification would be appropriate. Sanchez inexplicably argues that *Kosanke* would not support admitting evidence of an effort to prevent the Carrillo children from appearing and testifying at trial unless (1) the children's testimony at trial differed from their earlier statements to law enforcement, (2) the change was proved to result from Witchley's and Walsh's assistance with relocation and improper influence, and (3) concrete evidence established that the children's relocation was at Sanchez's behest. Br. of Appellant at 41. *Kosanke* imposes no such requirements. The relevance of the evidence is in what it

reveals about the state of mind of the defendant. Whether the effort to prevent the appearance and testimony of a witness is successful is beside the point.

¶71 If the foundational threshold were crossed, we agree with the trial court that all three *PUD No. 1* factors were demonstrated. The trial court correctly concluded that Witchley and Walsh had thrust themselves into the case as likely witnesses, the first factor. As to the second—whether evidence of the lawyers' conduct is unobtainable else-where—Sanchez argued that evidence of the children's removal was obtainable from the children themselves, their father, the police detectives who later located and inter-viewed them, investigator Freeman, or the interpreter who assisted Witchley and Walsh. But only Witchley and Walsh could testify to their own motivation and Mendez could reasonably insist on calling them for that reason. Moreover, should Mendez choose to present evidence of the children's relocation through other witnesses, there was a real pros-pect that Sanchez's interests would require the testimony of Witchley or Walsh in response. As the trial court observed, once the issue is raised, "[H]ow else (or who else) is available to testify that 'Nobody's hiding anything' except Walsh and Witchley?" CP at 869.

¶72 The third factor in the disqualification analysis is whether the lawyer's testimony is or may be prejudicial to his or her client. In this connection, the trial court must assess prejudice in the context of the entire case, taking into consideration the subject matter of the testimony and whether the lawyer's testimony is likely to be challenged in cross-examination, impeached, or otherwise contested.

¶73 *Cottonwood Estates*, 128 Ariz. 99, the Arizona deci-sion from which our Supreme Court adopted the three-part *PUD No. 1* test, is instructive on this score. In that fraudu-lent conveyance case, the plaintiffs notified the court that they intended to call defense lawyer Michael Rubin as a witness in light of his service as an officer of the defendant corporation and—as an officer—his direct participation in

the challenged transfers of assets. *Id.* at 102. Resisting the lawyer's disqualification, the defendant argued that his testimony would be uncontested, not prejudicial, and in any event the client would consent to it.

¶74 But the fact that a lawyer's testimony will be in lockstep with the client's trial theory is not the answer to this question. The court found that the prejudice required by the third factor was present, explaining:

> The clients' consent notwithstanding, we do not see how [the] testimony . . . can be anything but material and in this case prejudicial. Even if Rubin believes his testimony will be uncontested, it is quite clear he will be impeached. As a result of the impeachment, the fact finder need not believe Rubin. . . . The evidence was material, the testimony contested, and the witness subject to impeachment. . . . The court in its discretion properly ordered his disqualification.

*Id.* at 105 (citation omitted); *cf. United States v. Melo*, 702 F. Supp. 939 (D. Mass. 1988) (ordering disqualification of counsel where jury was likely to speculate about attorney's role in engaging in allegedly wrongful activity on behalf of his client unless adequate waivers could be secured). This broad view of the potential for prejudice is supported by the language of the ethical rule itself, which makes no mention of prejudice but only whether "the testimony relates to an uncontested issue." RPC 3.7(a)(1).

¶75 The issue of the children's relocation was generally problematic for Sanchez. The reasons for it would be in contention. The lawyers' participation as witnesses to that issue would put them in the position of " 'acting both as a witness trying to persuade the jury as to a particular set of factual events and also an advocate for this set of factual events,' " something that Washington decisions have identified as " 'exactly the circumstance that [RPC] 3.7 is designed to avoid.' " *Schmitt*, 124 Wn. App. at 667 (quoting trial court ruling with approval). The third factor, prejudice, would therefore be present as well.

¶76 Sanchez contends the court trivialized the potentially overriding consideration of substantial hardship for the client by ignoring Witchley's and Walsh's efforts. Clearly it did not. The court acknowledged Witchley's and Walsh's 19-month development of Sanchez's defense, as well as their successful efforts to deter the State from seeking the death penalty. But the substantial hardship factor is forward looking. The court recognized that it could appoint qualified substitute counsel. It also recognized that while substitution would delay proceedings, delay was foreseeable already. Sanchez had already announced his intention to seek discretionary review of the court's order releasing the Mendez interview summaries to the other parties.[8]

¶77 We conclude that at the time of the disqualification motion and based on information then available, Mendez did not establish that evidence of the relocation of the Carrillo children would be admissible at trial. But the trial court correctly concluded that the lawyers' participation in the relocation, and Mendez's zealous interest in pursuing the issue, presented a looming problem—and one that would be a serious problem if further evidence of Sanchez's involvement were developed prior to trial.

### 3. Conflict Concerns Arising from the Possibility of Criminal Charges

¶78 The third basis for disqualification, and an independently sufficient basis, was the prospect of criminal charges being filed against the defense lawyers—something that, so far as the record reveals, never happened but that was not an empty threat.

¶79 Before the sanctions hearing, the State notified the trial court that it might bring criminal witness tamper-

---

[8] Sanchez did seek discretionary review. A commissioner of this court issued a ruling denying discretionary review on April 3, 2007, and the decision became final on December 31, 2007.

ing or obstruction charges against Witchley and Walsh.[9] It planned further investigation into the lawyers' involvement in providing the airfare for the Carrillo children and was also concerned about an allegation unrelated to the Causor family murders: Mendez had alleged that Witchley made statements that Mendez understood as telling him to keep his mouth shut about an unrelated murder.[10] A person is guilty of tampering with a witness if, among other acts, he or she attempts to induce a witness, a potential witness, or a person having knowledge relevant to a criminal investigation to withhold testimony or relevant information, or to absent himself or herself from criminal proceedings. RCW 9A.72.120.

¶80 The Sixth Amendment right to counsel includes the "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981). A conflict of interest can arise when a defendant's lawyer is under criminal investigation or charged with a crime in the same jurisdiction where the defendant is facing trial. *See Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005); *United States v. McLain*, 823 F.2d 1457, 1464 (11th Cir. 1987), *overruled on other grounds by United States v. Lane*, 474 U.S. 438, 106 S. Ct. 725, 88 L. Ed. 2d 814 (1986). Among the conflicting interests between counsel under investigation and his client identified in *McLain* are the lawyer's possible interest in avoiding conflict with prosecutors, the lawyer's possible interest in delay, and the lawyer's possible desire to reserve negotiation tactics for his own criminal proceeding. 823 F.2d at 1464.

¶81 Upon notification that an actual or potential conflict of interest exists, a trial court has the obligation

---

[9] The State had also raised a prospect of intimidation of a public servant charges against Walsh for threatening a bar complaint against Fessler if he filed a protective appearance of counsel on behalf of Mendez, but the trial court viewed Walsh's actions as zealous advocacy, not a violation of RPC 4.4.

[10] Investigator Freeman adamantly denied in his sworn declaration that Witchley ever made any such statements to Mendez.

" 'either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel.' " *Campbell*, 408 F.3d at 1170 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978)). If the trial court fails to undertake either of these duties, the defendant's Sixth Amendment rights are violated. *Id.*

¶82 In *Wheat*, 486 U.S. 153, the Supreme Court set forth the standards under which a trial court constitutionally could refuse to allow conflicting representation whether or not a defendant was willing to waive a conflict—in *Wheat*, the particular conflict was defense counsel's representation of multiple defendants. The Court rejected the defendant's contention that waivers from affected defendants cured the problem, noting that the courts "have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160. It also recognized the trial court's need to act on "potential" conflicts as well as "actual" conflicts. As summarized by a leading treatise:

> [T]he *Wheat* majority characterized as "rare" any case in which "an actual conflict may be determined before trial"; the "more common" case was that in which the court finds that "a potential for conflict exists which may or may not burgeon into an actual conflict." Because the likely materialization and dimensions of such potential conflicts are "notoriously hard to predict" in the "murkier pretrial context when relationships between parties are seen through a glass darkly," the Court concluded that a trial court can properly find, upon a showing of "a serious potential for conflict," that the presumption favoring defendant's choice of counsel should be overridden.

3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 11.9(c) at 896 (3d ed. 2007) (footnote omitted) (quoting *Wheat*, 486 U.S. at 162-64).

¶83 The Court concluded in *Wheat* that in disqualifying counsel on the basis of a serious potential for conflict, the

trial court could not be said to have "exceeded the broad latitude which must be accorded it in making this decision." *Wheat*, 486 U.S. at 163. Courts have applied the discretion established in *Wheat* in cases in which defense counsel was alleged to have been involved in criminal activity or professional misconduct that would bear upon his representation of the defendant. *See, e.g., United States v. Arrington*, 867 F.2d 122 (2d Cir. 1989) (attorney alleged to have been involved in a plot to silence witnesses); *United States v. Register*, 182 F.3d 820 (11th Cir. 1999) (in sustaining disqualification of a lawyer under investigation for improper conduct, the court notes that the existence of the investigation could have provided the defendant with grounds for a subsequent successful challenge to any conviction on counsel-conflict grounds).

¶84 This broad latitude recognized for the trial court's exercise of its obligation to enforce Sixth Amendment rights accords with the trial court's separate, state law authority to decide disqualification motions in conflict situations. Washington courts have inherent power to determine who may appear before them as legal counsel. *Hahn*, 95 Wn.2d at 31 (citing *State v. Cook*, 84 Wn.2d 342, 525 P.2d 761 (1974)). Among the grounds on which an attorney may be disqualified are a conflict of interest that prejudices the rights of his or her client or former client or an opposing party, or that poses a threat to the integrity of the judicial process. *See* RPC 1.7, 1.9-1.12; *Hahn*, 95 Wn.2d at 36 (conflict prejudicing opposing party and threatening integrity of judicial process (citing *Ceramco, Inc. v. Lee Pharm.*, 510 F.2d 268 (2d Cir. 1975))); *State v. Stenger*, 111 Wn.2d 516, 760 P.2d 357 (1988) (conflict prejudicing former client). A court's exercise of discretion is viewed not in hindsight, but in view of the circumstances before the court at the time of its decision. *See In re Det. of Duncan*, 167 Wn.2d 398, 408, 219 P.3d 666 (2009).

¶85 Whether circumstances demonstrate a conflict under ethical rules is a question of law we review de novo.

*RWR Mgmt., Inc. v. Citizens Realty Co.*, 133 Wn. App. 265, 279, 135 P.3d 955 (2006) (citing *State v. Vicuna*, 119 Wn. App. 26, 30-31, 79 P.3d 1 (2003)). Determining the proper resolution of the alleged conflict requires the exercise of discretion, and we review the trial court's resolution for abuse of discretion. *Id.* at 279-80 (citing *PUD No. 1*, 124 Wn.2d at 813; *Wheat*, 486 U.S. at 164).

¶86 Sanchez contends that there was no credible indication that the State could charge Witchley and Walsh with witness tampering and that the court failed to distinguish cases where charges had been filed against a lawyer from this case, involving only "the prosecutor's bluster." Br. of Appellant at 48. But the trial court was obliged to consider what it was hearing from all of the lawyers, not just Witchley's and Walsh's sanguine assessment that they had done nothing wrong. Here, the State not only notified the trial court of the prospect of a criminal investigation, it had asked—if Witchley and Walsh remained on the case—that the court require a written conflict waiver to be obtained from Sanchez.

¶87 The prosecutor continually reiterated that he wanted to "tread very lightly"; he expressed concern about the prospect of future serious complications. RP (Nov. 17, 2006) at 56. While allowing that the contentions at the sanctions hearing were an issue between the codefendants, not involving the State, he added:

> There's some things that were obviously highly unusual that caused some concern and still does. . . . It is very highly unusual. And one of the concerns we have is how this actually happened where people were actually allowed to leave the State. And if all the allegations are true, which we have no reason to believe they aren't, how they financially were able to move witnesses out of the State. Highly unusual. I've never in all my years ever experienced anything like that. . . .
>
> . . . We're concerned how things were financed and whether or not full disclosure was made to whatever agency was funding these things. But that's something we're not privy to.

*Id.* at 56-57.

¶88  Ultimately, the trial court concluded that it was not for the court to say whether Witchley and Walsh would be charged, but only to assess whether the allegations created a serious potential for future conflict. It concluded it was not required to await actual conflict before factoring the potential for criminal charges into its disqualification decision.[11] We agree.

¶89  The specter of criminal charges against counsel was a tenable reason supporting disqualification, even without factoring in conflict concerns posed by Mendez's announced interest to call Witchley and Walsh as trial witnesses.[12]

## II. Conduct of Trial in Jailhouse Courtroom

¶90  We next address Sanchez's challenge to the conduct of his trial in a jailhouse courtroom. For security reasons, the possibility of holding Sanchez's trial in a courtroom in the county jail across the street from the county courthouse had been raised by the time of a pretrial conference held in October 2007. Final consideration was given to the issue at a hearing several weeks later. Sanchez argued that the

---

[11] Elsewhere, Sanchez contends the trial court failed to apply the proper standards because it relied on a withdrawn version of *Campbell v. Rice*, 265 F.3d 878, *withdrawn*, 302 F.3d 892 (9th Cir. 2001). But after first citing the withdrawn version of *Campbell* in his sanctions ruling, the trial court corrected its mistake by citing the updated opinion in its reconsideration ruling. Moreover, as the trial court noted in its reconsideration ruling, the updated opinion in *Campbell*, 408 F.3d 1166, applies the same legal standards as the withdrawn opinion.

[12] Were we not satisfied that the trial court did not abuse its discretion, we would consider whether any error was harmless. We have inherent authority to consider issues not raised by the parties and to decide an appeal on that issue. *State v. Aho*, 137 Wn.2d 736, 740-41, 975 P.2d 512 (1999); *State v. Carter*, 138 Wn. App. 350, 368, 157 P.3d 420 (2007). We have previously questioned whether a new trial is appropriate relief where a matter has been tried with able counsel. *RWR Mgmt.*, 133 Wn. App. at 280. While the United States Supreme Court thereafter concluded in *Gonzalez-Lopez*, 548 U.S. 140, that disqualification of counsel is structural error if the constitutional right to retained counsel is at issue, an arguable negative implication of *Gonzalez-Lopez* is that if the constitutional rights to counsel of choice or effective counsel are not at issue—the case here—harmless error analysis would apply. Not having requested supplemental briefing on this issue, we decline to reach it. RAP 12.1.

jailhouse courtroom created an environment that increased the impression he was in custody or under restraints, thereby violating his due process right to a fair trial.

¶91 In deciding the trial locale, the parties and the trial court recognized the importance of *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981), which adopted a fact-finding requirement and case-specific factors to be considered in deciding whether courtroom security justified using physical restraints on an inmate defendant or inmate witness. *Hartzog*'s application had been broadened by this court's decision in *State v. Gonzalez*, 129 Wn. App. 895, 120 P.3d 645 (2005), which extended *Hartzog* hearing requirements to a trial court's decision to instruct the jury that an indigent defendant was in custody. *Gonzalez* spoke broadly of the need for such hearings, stating, "If the court determines the need for *security measures that cannot be concealed from the jury*, the judge must make a record of a compelling individualized threat of injury to people in the courtroom, disorderly conduct, or escape." 129 Wn. App. at 902 (emphasis added).

¶92 Accordingly, in response to Sanchez's motion, the trial court conducted an evidentiary hearing. The State presented evidence addressing the factors first adopted by the Court of Appeals in the *Hartzog* case[13] that were thereafter approved by the Supreme Court. *See* RP (Oct. 23, 2007) at 10. Those factors are

" '[t]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the court-

---

[13] *See State v. Hartzog*, 26 Wn. App. 576, 615 P.2d 480 (1980), *aff'd in part, rev'd in part*, 96 Wn.2d 383.

room; and the adequacy and availability of alternative remedies.' "

*Hartzog*, 96 Wn.2d at 400 (alteration in original) (quoting *State v. Hartzog*, 26 Wn. App. 576, 588, 615 P.2d 480 (1980) (quoting *State v. Tolley*, 290 N.C. 349, 368, 226 S.E.2d 353 (1976))).

¶93 At the hearing below, the trial court heard testimony from four law enforcement officers responsible for courthouse security or otherwise personally knowledgeable about relevant facts specific to Sanchez and his upcoming trial. Appearing to testify were Sergeant Joel Clifford, whose main responsibility with the sheriff's department was for security at county facilities; Will Paulakis, a division chief with the Yakima County Department of Corrections (DOC); Yakima County DOC chief Michael Williams, who oversees security classification of jail inmates; and Detective Kellett.

¶94 After hearing from the witnesses and argument of counsel, the court decided to conduct trial in the jailhouse courtroom, relying on the following facts established in the hearing or that were judicially noticeable at the time: Sanchez was charged with two counts of aggravated first degree murder and two counts of attempted murder, including the killing of a child. He was almost 26 years old, in good physical condition, and had a history of prior assaults. He exhibited threatening behavior in jail toward a fellow inmate and toward Detective Kellett. He had recently threatened suicide. The case was a high profile matter, and as the court observed, "There [are] going to be people in the community watching this case, perhaps people who have strong views about this case and potentially would have thoughts of doing harm to either the defendant or other participants in the trial." RP (Oct. 23, 2007) at 85.

¶95 The court was likewise aware of an earlier altercation outside the jail courtroom between the victim and defendant family members during Sanchez's arraignment—after those individuals had passed through a metal detector. The court remained concerned because it did not

have any evidence that "hostilities between those camps, if you will, have cooled down to the point where they wouldn't rise again."[14] *Id.* at 80-81. Considering all, the court deemed the use of the jailhouse courtroom necessary to ensure the safety of those in the courtroom and to prevent disorderly conduct.

¶96 While appeal was pending in this matter, the Washington Supreme Court accepted review of a due process challenge to trial in a jailhouse courtroom and in May 2010 issued its decision in *State v. Jaime*, 168 Wn.2d 857, 233 P.3d 554 (2010), in which it reversed the conviction of a Yakima defendant whose trial had taken place in the same jailhouse courtroom as did the Sanchez trial.[15] The court held in *Jaime* that conduct of trial in the unique setting of a traditional courtroom contributes a " 'dignity essential to "the integrity of the trial" process' " and that setting the trial somewhere else instead—and in particular, in a jail—creates a risk of eroding the presumption of innocence. 168 Wn.2d at 866-67 (quoting *Estes v. Texas*, 381 U.S. 532, 561, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965) (Warren, C.J., concurring) (quoting *Craig v. Harney*, 331 U.S. 367, 377, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947))). While the *Jaime* court held that conducting a trial in a jailhouse courtroom is inherently prejudicial, the court also made clear that its decision "should not be misunderstood to suggest that a jailhouse courtroom may never be used for a jury trial." *Id.* at 865.

¶97 *Jaime* explains that " '[a] trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury.' " *Id.* (quoting *Hartzog*, 96 Wn.2d at 400).

---

[14] The altercation was mentioned in Sergeant Clifford's testimony, but the trial court was familiar with it from prior proceedings. The altercation, and television coverage of it, had been discussed during the pretrial hearing regarding admissibility of Michelle Kublic's eyewitness identification. Apparently, an ambulance was called in to take away one of the participants in the altercation.

[15] This appeal was stayed pending the Supreme Court's decision in *Jaime*.

" ' " "[C]lose judicial scrutiny" is required to ensure that inherently prejudicial measures are necessary to further an essential state interest.' " *Id.* (quoting *State v. Finch*, 137 Wn.2d 792, 846, 975 P.2d 967 (1999) (quoting *Estelle v. Williams*, 425 U.S. 501, 504, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976))). Analogizing to other inherently prejudicial practices such as shackling, the court stated that "[i]n particular, a trial court may impose restraints upon a defendant ' "only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape." ' " *Id.* at 865-66 (quoting *Finch*, 137 Wn.2d at 846 (quoting *Hartzog*, 96 Wn.2d at 398)). "The judge's decision must take into account 'specific facts relating to the individual' and be 'founded upon a factual basis *set forth in the record.*' " *Id.* at 866 (quoting *Hartzog*, 96 Wn.2d at 399-400).

¶98 Because the trial court in *Jaime* had not engaged in fact-finding, based its decision on unverified representations of a prosecutor, and considered impermissible factors, the Supreme Court was unable to say that holding the trial in the jail was necessary to further an essential state interest. On that basis, it reversed Jaime's judgment and sentence.

¶99 If the trial court has engaged in the required fact-finding and based its decision on permissible factors, our review is deferential. *See id.* at 865-66. *Hartzog* rejected a defense argument that appellate courts must "independently review the record to determine if the trial court has made the proper balancing of interests," 96 Wn.2d at 397, and held that the standard for appellate review will instead be "whether the trial court has abused its broad discretion to provide for order and security in the courtroom." *Id.* at 401. *Jaime*, citing *Hartzog*, likewise identifies abuse of discretion as the appropriate standard of review. *Jaime*, 168 Wn.2d at 865.

¶100 A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or

untenable reasons. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997); *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Discretion also is abused when it is exercised contrary to law. *Tobin*, 161 Wn.2d at 523.

¶101 In this case, the trial court did not rely on unverified representations of a prosecutor. Knowledgeable law enforcement officers appeared, testified, and were cross-examined. Both the parties and the court had in mind and expressly addressed the *Hartzog* factors. It is true that without the benefit of the *Jaime* decision, the State presented evidence on factors identified as impermissible in *Jaime*, including cost and convenience to the affected agencies and the general transport concerns that would apply to any defendant who is in custody during trial. But we find it clear from the trial court's oral ruling that these impermissible factors were not consequential considerations for the court.

¶102 Sanchez recognizes that the trial court based its decision on facts specific to his background and prosecution and explicitly considered the *Hartzog* factors, and that our role is not to engage in our own balancing of interests, but to determine only whether Sanchez has demonstrated that the trial court abused its discretion—or, stated differently, that " 'no reasonable judge would have reached the same conclusion.' " *State v. Hager*, 171 Wn.2d 151, 156, 248 P.3d 512 (2011) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997)). He therefore seeks to persuade us that the trial court committed two legal errors: first, by considering not only danger presented by Sanchez but also danger presented by third parties, including danger *to* Sanchez; and second, by evaluating the jailhouse courtroom in relative terms and considering whether ramped-up security in the county courthouse could itself detract from the presumption of innocence.

¶103 According to Sanchez, any consideration of these matters constituted reversible error. We disagree.

¶104 In his briefing and at oral argument, Sanchez argued that a trial court's decision to hold trial in a jailhouse courtroom must be based on the very same risks—and only the same risks—that would justify shackling an inmate: that the inmate presents a threat of escape or a threat of injury to others or has disrupted trial court proceedings. *See, e.g.,* Reply Br. of Appellant at 9. It was therefore error, according to Sanchez, for the trial court to consider danger presented by others, including to Sanchez.[16] But the trial court rightly recognized its responsibility to consider the dangers to all trial participants implicated by its choice of a courtroom. As observed in *Hartzog*:

> It is fundamental that a trial court is vested with the discretion to provide for courtroom security, in order to ensure the safety of court officers, parties, and the public. This responsibility has been recognized by the United States Supreme Court:
>
>> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.

96 Wn.2d at 396 (quoting *Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)).

¶105 Although the *Jaime* court chose shackling cases as analogous to the security measure of conducting trial in a jailhouse courtroom, its decision cannot reasonably be read to imply that a jail courtroom can be used only if the danger posed by the defendant requires shackling. Indeed, in this case, one advantage of the jailhouse courtroom from the trial court's perspective was that Sanchez could remain

---

[16] The court's oral ruling included the following, for example:

I think it's important to note for the record that jail courtroom two has a holding cell immediately within steps from where the defendant would be seated in this particular case. And if there is any potential for violence or threat to Mr. Sanchez, jail security can immediately get him out of the courtroom and into that holding cell where he would be safe.

RP (Oct. 23, 2007) at 82.

unshackled. In announcing its decision, the court pointed out:

> Mr. Sanchez is going to be attired in civilian clothes. The jury is not going to view him in shackles or handcuffs or leg irons or other restraints.
>
> . . . I have found that because of the secure nature of jail courtroom number two it's appropriate for Mr. Sanchez not to have those restraints on him so he can make notes and make his best effort to help counsel during trial. The security staff has some concerns about that. Frankly, I think under the circumstances with their presence that's appropriate.

RP (Oct. 23, 2007) at 83-84; *cf.* RP (Oct. 3, 2007) at 45-46 (court ordered Sanchez's shackles removed so that he could take notes, over jail guard's expressed preference that Sanchez "keep them on at all times if possible").

¶106 Sanchez also argues that it was legal error for the trial court to give any consideration at all to the relative due process impact of heightened security measures required if trial were held in the county courthouse. Sanchez cites to the observation in *Holbrook v. Flynn*, 475 U.S. 560, 569, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986) that "[o]ur society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm"—an observation that *Jaime*, too, cites as authoritative. *See Jaime*, 168 Wn.2d at 863.

¶107 But as *Jaime* itself notes, the *Holbrook* court was speaking only of the nonprejudicial presence of security guards "*in general.*" *Id.* Contrary to Sanchez's argument, *Holbrook* does not support the proposition that there is a black-and-white distinction to be made, such that jailhouse courtrooms always violate due process, while ramped-up security in a county courthouse raises nary a due process concern. Frankly, we cannot deduce from *Holbrook* whether the United States Supreme Court would even agree that jailhouse courtrooms are inherently prejudicial, since it

addressed only heightened security in regular courtrooms as contrasted with trying inmate defendants in shackles or prison garb. State courts have drawn different conclusions. *See Jaime*, 168 Wn.2d at 878-79 (J.M. Johnson, J., concurring in dissent) (collecting cases).

¶108 *Jaime* is controlling for us, of course, and identifies a salient reason why jailhouse courtrooms are inherently prejudicial: jurors are not inured to the experience of being in a jail building. As a result, Washington defendants are assured that any decision to use a jailhouse courtroom will implicate the procedural requirements and standards of *Hartzog* and *Jaime*, whereas a court's decision to enhance security in the county courthouse will not. But *Jaime* does not suggest that trial courts should be unconcerned about jurors' probable reaction to unusual and noticeable security enhancements that might be required if trial is to take place in a relatively less secure courtroom in a county courthouse. Even the United States Supreme Court observed in *Holbrook* that "[t]o be sure, it is possible that the sight of a security force within the courtroom might under certain conditions 'create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.'" 475 U.S. at 569 (quoting *Kennedy v. Cardwell*, 487 F.2d 101, 108 (6th Cir. 1973)).

¶109 It does not offend *Jaime* for a trial court to consider how jurors will perceive extra security procedures required in the county courthouse for a particularly dangerous case so long as the trial court at the same time recognizes the unique problem with use of a jailhouse courtroom, as this trial court did.[17] "'In weighing the protection of persons in the court-

---

[17] The trial court showed no predisposition to favor the jailhouse courtroom, candidly describing it as a "monolithic concrete building." RP (Oct. 23, 2007) at 84. In announcing its decision to use the jailhouse courtroom, it noted that it had presided over at least four homicide trials in the county courthouse:

But in each case the considered decision of the Department of Corrections and the court was that those particular defendants, for a variety of factors, do not pose a risk of escape or a risk of violence while being transported or being a target for violence while being transported. In each of those cases the factor, I

room and the rights of a defendant, the trial judge must choose from "a wide variety of possible choices all within the permissible areas of judicial discretion." ' " *Hartzog*, 96 Wn.2d at 401 (quoting *Hartzog*, 26 Wn. App. at 589 (quoting *State v. Basford*, 1 Wn. App. 1044, 1050, 467 P.2d 352 (1970))).

¶110 As we held in *State v. Rodriguez*:

> A trial court judge, grounded in the community, knowing the anticipated content and context of the trial, and who has heard and carefully considered factual information provided by law enforcement and State and defense lawyers familiar to him or her must be free to consider the options in deciding whether a setting outside the usual courthouse is, indeed, "the 'fairest and most reasonable way to handle' defendants who are found to present a serious safety risk"—as *Jaime* acknowledges a jailhouse setting may be. 168 Wn.2d at 865 (quoting *Illinois v. Allen*, 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)).

163 Wn. App. 215, 227, 259 P.3d 1145 (2011), *review denied*, 173 Wn.2d 1009 (2012). Here, the trial court's decision might have gone either way. We are fully satisfied, however, that the decision to hold the trial in the jailhouse courtroom was not an abuse of discretion.

### III. Eyewitness Identification Testimony

¶111 Sanchez assigns error to the trial court's order denying his motion to suppress any in-court identification by Kublic on the basis that her ability to identify him had been irreparably tainted. The court denied the motion following a three-day hearing. At trial, Sanchez was able to cross-examine Kublic about her identification and was permitted to call Dr. Robert Shomer, a forensic psychologist, who testified to problems with eyewitness identification in

---

think, that drove the court's decision to allow the trial to be held in the courthouse was that those potential problems either didn't exist or they were all mitigated in some way.

*Id.* at 79-80.

general and Kublic's identification of Sanchez in particular. Sanchez argues that the latitude he was given to challenge Kublic's eyewitness identification was not enough; her testimony identifying Sanchez should have been excluded.

¶112 In its most recent decision addressing eyewitness testimony challenged as unreliable, the United States Supreme Court held that the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, ___ U.S. ___, 132 S. Ct. 716, 723, 181 L. Ed. 2d 694 (2012). It continued:

> Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel, compulsory process, and confrontation plus cross-examination of witnesses. Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial. Only when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice" have we imposed a constraint tied to the Due Process Clause.

*Id.* (citations omitted) (quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990)).

¶113 Mistaken eyewitness identification is a leading cause of wrongful conviction, as recognized by Washington courts. *See State v. Riofta*, 166 Wn.2d 358, 371, 209 P.3d 467 (2009) (" 'The vast majority of [studied] exonerees (79%) were convicted based on eyewitness testimony; we now know that all of these eyewitnesses were incorrect' " (alteration in original)) (quoting Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 60 (2008)). To protect a defendant against unreliable eyewitness testimony, our Supreme Court held in *State v. Cheatam*, 150 Wn.2d 626, 649, 81 P.3d 830 (2003) that when eyewitness identification is a key element of the State's case, the trial court has

discretion to admit expert testimony on the subject to assist the jury in assessing its reliability, as was done here.

¶114 By contrast, for the *exclusion* of eyewitness identification to be required by the due process clause, the unnecessarily suggestive circumstances of the identification must have been arranged by law enforcement. The due process clause does not require a judicial inquiry into identifications whose reliability is in doubt for other reasons. *Perry*, 132 S. Ct. at 730. Police use of an unnecessarily suggestive procedure need not have been intentionally suggestive to trigger the requirement for judicial inquiry, however. *Id.* at 721 n.1.

¶115 "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary," and, "[e]ven when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence." *Id.* at 724 (citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109, 112-13, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)). Courts employ a two-part analysis to determine whether the challenged identification is admissible. *State v. Vickers*, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). First, the defendant must establish that "the identification procedure was impermissibly suggestive." *Id.* If the defendant fails, the inquiry ends. Only if the defendant carries the burden of showing the identification procedure was impermissibly suggestive does the court then consider, "based upon the totality of the circumstances, whether the procedure created a substantial likelihood of irreparable misidentification." *Id.*

¶116 In the second part of the analysis, courts consider the reliability factors set forth in *Neil v. Biggers*,[18] which can overcome the corrupting effect of the suggestive iden-

---

[18] The *Biggers* factors include (1) the witness's opportunity to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

tification procedure. *State v. Linares*, 98 Wn. App. 397, 401, 989 P.2d 591 (1999) (setting forth factors identified in *Biggers*, 409 U.S. 188). The effect of this second, due process check is to expand the range of identification testimony that can be heard by the trier of fact. *State v. Vaughn*, 101 Wn.2d 604, 608, 682 P.2d 878 (1984); *Perry*, 132 S. Ct. at 719 (characterizing the second step as a "due process check").

¶117 The suppression hearing in this case took place well before the United States Supreme Court's decision in *Perry*, and Sanchez relied on expert testimony that Kublic's eyewitness identification was unreliable due to a confluence of events not limited to suggestive police procedures. Sanchez relied upon the following timeline of events associated with Kublic's identification and exposure to information in arguing unreliability:

¶118 *February 21, 11:55 a.m.* Officer Cortez obtained Kublic's initial description of the two assailants, as follows:

| Description of first assailant: | Description of second assailant: |
| --- | --- |
| Hispanic, in his 20s, wide nose, about 5 feet 5 inches tall, lighter complexion than the other; bigger build than the other. | Hispanic, about 5 feet 1 inch tall, thinner than the first man, "sucked in face," "small and dingy looking," uncombed, matted hair. RP (Oct. 3, 2007) at 87. |
| She felt she initially surprised this suspect because he did not have a mask on. He later did. | Forced her out of her vehicle and walked her to her apartment at gunpoint. |
| Accompanied Causor to the other room, while the second stayed with her and the children. | Shot Causor. |

¶119 *February 21, afternoon or evening.* Officer Cortez and another officer showed Kublic four arrays of photographs, with six pictures to a page ("six-packs"), depicting persons of interest. She was admonished that the suspects may or may not be in the photographs and that it is just as important to clear innocent people as it is to select a guilty person. She recognized several individuals from gang affili-

ations and other contacts but did not pick any suspect from the arrays.

¶120 *February 22, 9:15 a.m.* Detective Kellett visited Kublic and asked her to help him construct a composite image of the assailant she could remember best. She provided the following description:

| First suspect: | Second suspect: |
| --- | --- |
| Had a mask, and she does not remember him as well as the second. | Did not wear a mask; she remembers him well. |
| | Hispanic, thin and gaunt looking with long unkempt hair, a short or thin mustache, hollow cheeks. |

Kublic did not tell Detective Kellett which man was the shooter. The following composite image was generated during this conversation:

CP at 662. Kublic told the detective that the composite was good but that the suspect had longer hair, his cheeks were hollower, and the chin was not right.

¶121 *February 22, 12:30 p.m.* Officer Cortez showed her a fifth photo array (a six-pack) while she was sedated. She picked out an individual who was arrested and booked, but he was released the next day, after she was unable to identify him when more alert.

¶122 *February 22, afternoon or evening.* Officer Cortez showed her a sixth photo array (again a six-pack). Sanchez

was not yet a suspect but was randomly included. Kublic did not pick anyone out as a suspect.

¶123 *February 23, evening*. Detective Kellett presented Kublic with a 20-page array, with larger photos on individual pages. He asked if she remembered the admonishment provided earlier and, when she said she did, did not admonish her further. She positively identified the suspect on page 3 (Mendez) as "the one without a mask." RP (Oct. 3, 2007) at 164. The following was the booking shot she identified:

CP at 670. Kublic asked if the person in this third photo was in jail already, and the detective responded they were "looking to arrest those suspects." RP (Oct. 3, 2007) at 165. Sanchez's booking photo (the same photo included in Officer Cortez's sixth array) was also included in the serial array, but she did not identify him. Detective Kellett did not know at the time that he was repeating the Sanchez photo, but he did know that Sanchez had been arrested and jailed earlier that day.

¶124 *February 26*. Kublic was released from the hospital to her father's home.

¶125 *March 2*. Kublic traveled to Detective Kellett's office to provide a taped interview. Sanchez had repeatedly been shown on television news reports and on the front page of the newspaper. During the interview, Kublic made the following statements:

"Kellett: What did these guys look like that came up while you were in the Suburban?

"Kublic: Um, the guy, I thought he had hair but after I see him . . . on the news, um, he's the one with the shaved head, the one they have."

CP at 656 (emphasis omitted), and thereafter,

"Kellett: So one of 'em had longer hair or long hair[?]

"Kublic: Um, yeah[.]

"Kellett: And one of 'em had a shaved head?

"Kublic: Um-hum, and I thought the one that, that ah, that shot had hair but when I saw his face, it all came back to me, you know, after I saw his face, it all came back to me and I could see, you know, I told you he had a concentrated look on his face and it was the guy."

CP at 656-66 (emphasis omitted).

¶126 Later, at the suppression hearing, Kublic could not recall having watched the news or having seen Sanchez before March 2.

¶127 *Sometime after March 2.* Kublic testified that sometime after March 2, she saw a newspaper clipping of an article about the crime, including a photo of Sanchez, near the cash register in a convenience store.

¶128 *April 12.* Kublic attended a court hearing attended by Sanchez and saw him in jail clothes and handcuffs.

¶129 Kublic testified at the suppression hearing that during the entire time she was in the hospital she needed pain medication and wanted to sleep. According to her, she started thinking clearly about what had happened only after she was discharged. She testified that it became clear in her own mind, without any input from police or anyone else, that the shooter was the man with the shorter hair. She had seen him clearly just before he pulled the trigger and was "100 percent sure" it was Sanchez. RP (Oct. 5, 2007) at 512.

¶130 Dr. Shomer, the defense expert, testified at the hearing that the combination of Kublic viewing Sanchez in a six-pack array, then in a serial array, then in a newspaper clipping, and (according to witness interview transcripts he had reviewed) in the news media, irrevocably tainted her memory and irreparably undermined the validity of her identification. He testified that these exposures were contributed to by the Yakima Police Department's failure to employ "safeguards" that increase the likelihood of a proper eyewitness identification. RP (Oct. 4, 2007) at 212.

¶131 Dr. Shomer testified that law enforcement safeguards for reliable eyewitness identification include (1) an admonition preceding the showing of *every* array, whether or not the witness received the admonition when presented with an earlier array; (2) recording the entire identification session for purposes of future forensic examination; (3) double blind procedures, meaning that the administrator of the procedure is not privy to facts of the case, in order to ensure that he or she does not inadvertently convey information to the witness by word or reaction; (4) avoiding repetition of an image, since repetition can create source confusion and a possible belief by the witness that the suspect is familiar from the crime scene; and (5) warning a witness to a newsworthy crime not to watch the news, a step he characterized as "recommended procedure" and "wise." *Id.* at 242.

¶132 Having heard the evidence, the trial court denied the motion to suppress on the basis of the threshold question: whether the police employed impermissibly suggestive identification procedures.[19] While the court complimented Dr. Shomer as a well-versed and persuasive expert and acknowledged the safeguards he considered necessary for a reliable identification procedure, it found no evidence

---

[19] Kublic's mere failure to identify Sanchez in the photo arrays was no basis for exclusion. When an eyewitness fails to identify the defendant in photo arrays but does so in court, the reliability of that identification is a matter for the jury to decide. *Johnson v. McCaughtry*, 92 F.3d 585, 597 (7th Cir. 1996); *United States v. Briggs*, 700 F.2d 408, 413-14 (7th Cir. 1983).

that either Officer Cortez or Detective Kellett did anything that could be construed as unduly suggestive, nor did they violate any recognized obligation to guard against a witness viewing news coverage. The court reasoned:

> I think the police, despite not perhaps administering an admonition with each demonstration of an array, despite the fact that Kellett was the lead detective and he knew there was a suspect and he knew there was an arrest and he knew the name of Mr. Sanchez, there is no indication that he told that to Ms. Kublic in an effort to try to get her to pick him out of either of these photo arrays.
>
> Yes, there was repetition of his photo, but he . . . wasn't identified in either of those. And I don't think . . . there was some impermissible procedure employed by the police in this case.

RP (Oct. 11, 2007) at 654.

¶133 Because Sanchez had not met his burden of demonstrating unnecessarily suggestive police procedure, the trial court did not reach the *Biggers* reliability factors.

¶134 On appeal, Sanchez relies on the Yakima Police Department's failure to practice the safeguards outlined by Dr. Shomer. We review a trial court's decision on whether to admit an out-of-court identification for abuse of discretion. *State v. Kinard*, 109 Wn. App. 428, 432, 36 P.3d 573 (2001).

¶135 A good deal of Sanchez's argument on appeal fails as a result of the United States Supreme Court's intervening decision in *Perry*. Both in the trial court and on appeal his argument for exclusion depends, in large part, on the Court's statement in *Brathwaite* that "reliability is the linchpin in determining the admissibility of identification testimony," 432 U.S. at 114, and on his interpretation (shared by some others) that the reason why an identification is unreliable does not matter. If the source of unreliability makes no difference, Sanchez arguably could rely on Dr. Shomer's opinion, regardless of whether law enforcement

acted improperly in events detracting from the reliability of Kublic's identification or had any obligation to guard against those events. But *Perry*, decided after Sanchez briefed this appeal, explicitly rejected his reading of *Brathwaite*, explaining:

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. Petitioner requests that we do so because of the grave risk that mistaken identification will yield a miscarriage of justice. Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. *When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.*

132 S. Ct. at 720-21 (emphasis added) (footnote omitted).[20]

¶136 Accordingly, our focus on review is whether the trial court abused its discretion in light of Sanchez's burden of demonstrating unnecessary and suggestive law enforcement procedures that, while they need not have been intentional, must at least have been improper.

¶137 Sanchez, having been focused on reliability, has not demonstrated that any of the law enforcement conduct he characterizes as suggestive was improper. The closest he comes is testimony of Kublic when cross-examined at trial, in which she agreed that—while she could not recall police officers talking to her about arrests, Sanchez, or Mendez while she was in the hospital—she might have implied or stated as much to defense lawyers in an October 2006 interview. This was at trial, not in the suppression hearing;

---

[20] Sanchez did not request a jury instruction on the fallibility of eyewitness testimony. No error is assigned to the fact that the court did not give one.

in the suppression hearing, defense lawyers' efforts to establish even this point were unavailing.[21] This disputed evidence was insufficient to support exclusion. The officers who interviewed Kublic in the hospital denied making any such statements, Sanchez had no evidence to corroborate the sketchy concessions elicited from Kublic, and even her concessions did not suggest that whatever information was provided tied into photographs she had been shown. Notably, whatever information was provided did not cause her to identify Sanchez's photograph on the two occasions when she could have.

¶138 The fact that Kublic did not identify Sanchez from the photographs when she could have makes pointless some of Dr. Shomer's criticisms of the Yakima officer's procedures. After all, the problem with insufficient admonitions and improper comments or reactions in presenting photos (or the lack of a record that would capture them) is that the witness might identify a suspect that she otherwise would not. If Yakima police fell short of the standards accepted by Dr. Shomer for presenting an array, they nonetheless did not emerge from their presentation with an identification of Sanchez. *See State v. Outing*, 298 Conn. 34, 49-50, 3 A.3d 1 (2010) (simultaneous photographic array not unnecessarily suggestive per se even if not administered in a double-blind procedure); *State v. Marquez*, 291 Conn. 122, 153-56, 967 A.2d 56 (2009) (until scientific research produces more definitive answers, due process does not require suppression of photographic identification that is not the product of a double-blind sequential procedure).

¶139 The gravamen of Sanchez's complaint is that including his photograph in the sixth array and the 20-picture serial array created source confusion when Kublic later *did* recognize Sanchez from a newspaper photo,

---

[21] For the most part, Kublic would not agree that she had made statements that Sanchez's lawyers suggested she had when interviewed, and in some cases, the context of her statements was not clear. Transcripts of the interviews were not offered.

his courtroom appearance, or possibly other media. Yet the evidence is that inclusion of the picture in two arrays was unintentional. While a violation of the due process clause does not require mens rea, it does require improper police conduct, and Sanchez identifies no authority, direct or by analogy, that presenting a picture to a witness twice is improper. *Cf. State v. Smith*, 9 Wn. App. 279, 511 P.2d 1032 (1973) (presentation of photographic array of 11 photographs, 2 of which were of defendant, with his pictures being 2 of the 3 larger photographs presented, was not impermissibly suggestive); *United States v. Peele*, 574 F.2d 489, 491 (9th Cir. 1978) (where government was in no way responsible for publication of defendant's photo in the newspaper, any suggestive power of the photo was a matter for cross-examination, not a hearing on exclusion).

¶140 Finally, we note that while Sanchez has every right to persist in pointing to the fact that Kublic initially told police that the gaunt-faced suspect she described was the man without the mask, the State had an equal right to argue that she consistently provided descriptions of two distinct subjects—one reasonably consistent with Sanchez—even if, by March 2, her descriptions had essentially flipped as to which was the shooter. If other trial evidence was believed, Kublic had been somewhat confused about the roles of the two men she described from day one.

¶141 Her eventual position that Mendez was the gaunt-faced suspect and her intervening inconsistent references to "the man with the mask" and "the man without the mask" was an important area for vigorous cross-examination by Sanchez.[22] But her explanation that clarity came as she recovered was something the jury was entitled to

---

[22] In cross-examination at trial, for example, defense lawyers tried to get her to agree that the person she was able to describe and who was reflected in the composite was the man without the mask because "clearly you couldn't provide a description of the person with the mask presumably because he wore a mask, right?" RP (Nov. 15, 2007) at 1089. She answered, "I did, though," and when questioned how she was able to, if he had a mask on, answered, *"Because if you were paying attention, I told you earlier I had my lights on. The person that was*

believe. The trial court accurately commented that her initial descriptions did clearly differentiate between two suspects, and her competence due to pain and sedation was an issue. Yet much about her testimony indicated reliability. As the trial court further explained in its ruling:

> She gave a fairly comprehensive account of the night in question. She talked about how she saw both men. She talked about what happened in the living room, how she was forced to kneel and sort of sneak a peak . . . at whoever was holding her there. That, to me, indicates that there is a need for the jury to ascertain whether her in-court identification is reliable.

RP (Oct. 11, 2007) at 657.

¶142 The court did not err in admitting Kublic's eyewitness identification of Sanchez at trial. It provided the defense with broad latitude to challenge Kublic. The weight and credibility of her testimony was for the jury to decide. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992) (we defer to the trier of fact's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness of the evidence).[23]

¶143 The judgment and sentence is affirmed.

¶144 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accor-

---

*standing in front of me didn't have a mask on at first." Id.* at 1089, 1090 (emphasis added).

[23] Sanchez also asked that we determine whether, under article I, section 3 of the Washington Constitution, the *Biggers* factors, as a measure for broadening admissibility, should be rejected as not providing Washington citizens with the due process of law they are guaranteed. While Sanchez provided the analysis required by *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), this case is not an appropriate one to resolve that question. The trial court rejected Sanchez's suppression motion on the basis that he did not make the threshold demonstration of unnecessarily suggestive law enforcement procedure. We affirm the trial court's ruling on that basis. Neither the trial court nor we are required to address whether the due process check provided by applying the *Biggers* factors would make an otherwise inadmissible identification sufficiently reliable to be admitted.

dance with the rules governing unpublished opinions. RCW 2.06.040.

SWEENEY and KULIK, JJ., concur.

Reconsideration denied January 28, 2013.

Review denied at 177 Wn.2d 1024 (2013).