IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  51776-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| RONALD  BENJAMIN  WHITE  a/k/a  KURT COBAIN,  a/k/a  RONALD  BENJAMIN COPELAND, a/k/a AIREAS WEDGE, | |
| Appellant. | |

GLASGOW, J. — In June 2017, Ronald White's mother awoke in the middle of the night and saw that the front porch of her house was on fire.  She called 911 and safely got out of the house.  Damage from the June fire left her house temporarily uninhabitable.  While the house was still being repaired in October 2017, firefighters responded to a second fire at her home.  The October fire burned most of the house down to its foundation, resulting in a complete loss.  A neighbor's security camera recorded a person coming and going near the time of each fire.

The police identified White as the person appearing in the security videos and the State charged him with two counts of first degree arson.  White had mental health diagnoses and was homeless at the time.  Following a bench trial, the trial court found White guilty of both counts of first degree arson, each with a domestic violence designation, and imposed an exceptional upward sentence of 180 months of incarceration.

White appeals from his convictions and resulting sentence, contending that the State violated due process by presenting witness testimony identifying him as the person in the June video absent proper foundation and that the trial court allowed improper opinion testimony from

the victim that the suspect in the security videos appeared to have the same unusual gait as her son. White argues that the State failed to present sufficient evidence to support his convictions. White also asserts that based on his mental health issues, his defense counsel was ineffective for failing to pursue a diminished capacity defense and for failing to request an exceptional downward sentence.

White further challenges the imposition of a criminal filing fee and DNA collection fee. White has also filed a statement of additional grounds for review, in which he argues that he should have been given a mental health evaluation and that he was not able to understand the trial proceedings against him because the jail where he was being held during trial did not provide him with needed medications.

We affirm White's convictions but remand to the trial court to strike the criminal filing fee and to reconsider whether to impose the DNA collection fee.

## FACTS

In 2017, Ronald White's mother lived in a house in Aberdeen. White was homeless at the time and would frequently visit his mother's house. White's mother would sometimes invite White into the house for short periods of time; she regularly washed White's clothes and left the clothes for White in accessible areas outside of the house. She sometimes provided him with hot meals. As a result, he visited her home several times a week. At times, White's mother would leave a note near her doorbell telling White not to ring her doorbell, knock on the door, or linger on the porch.

One night in June, White's mother woke up to unusual noises and saw smoke entering her house through the top of her front door. She called 911 and safely got out through the back door.

Aberdeen Assistant Chief Fire Marshall Richard Malizia investigated the cause of the June fire. Based on burn patterns, Malizia determined that the fire originated on or under the porch of the house near the front door and then extended up to the attic. Malizia ruled out an electrical problem as the cause of the fire but could not identify an ignition source. Malizia's report said that the cause of the fire was undetermined.

The June fire damaged the roof, leaving the house temporarily uninhabitable. White's mother lived elsewhere while her house was being repaired.

Thomas Nostrant lived across the street from the house and had a security camera on his property that captured a portion of the victim's home. Nostrant provided police with footage that was taken from his security camera on the night of the June fire. The June video showed a person wearing a hooded sweatshirt approaching the victim's house from a public access stairway. The person hurried back down the stairway a few minutes later. Soon after, a fire erupted near White's mother's porch. The person who approached the house had their hood up and their face is not visible on the video. The video showed that the person had an unusual gait.

White's mother was still living in a rental unit in October 2017, when firefighters responded to a second fire at her house. When firefighters arrived, they found the house completely engulfed in flames. Firefighters eventually extinguished the fire, but it had burned most of the house to its foundation, resulting in a complete loss of the home. Malizia investigated the cause of the October fire, ruled out an electrical source, and could not locate a specific ignition source. After viewing security video footage taken from a Nostrant's security camera that showed a portion of the fire, Malizia determined that the October fire was intentionally set by someone using an accelerant.

The October security video again showed that a person in a coat and hooded sweatshirt approached White's mother's house from the public access stairway. The person was carrying something under their right arm. A few minutes later the same person left and walked back down the stairway, no longer carrying anything.

Two days after the October fire, police located White in downtown Aberdeen wearing clothing similar to the person in the October security video. White was later arrested and charged with two counts of first degree arson. The matter proceeded to a bench trial.

In addition to testimony consistent with the facts described above, the security videos of the June and October fires were admitted and played at trial. White's mother testified that she was familiar with the way her son walks and that the person on the security videos strongly resembled White, based on his gait.

Nostrant testified that while he had never been introduced to White, he knew who White was and he recognized White. Nostrant also testified that he had viewed security footage taken from earlier on the day of the June fire, which he said showed White's face. In that video from earlier in the day, White approached and left the victim's house. Defense counsel objected on the basis of inadequate foundation. The State asked Nostrant why he believed it was White in the earlier video footage, and Nostrant replied that the person on the video was not wearing a hood and that he could see White's face as he left. The trial court overruled defense counsel's objection.

Nostrant then added that the earlier footage showed White wearing the same clothing as the person wearing the hood up in the later footage. The earlier footage had been recorded over and was not available to view at trial.

4

The trial court found White guilty of both counts of first degree arson and entered findings of fact and conclusions of law. The trial court also found that the crimes involved domestic violence. At sentencing, the State sought an exceptional upward sentence of 180 months of incarceration under RCW 9.94A.535(2)(c)[1] because given White's high offender score, one or more of his current offenses would otherwise go unpunished.[2] In response, defense counsel acknowledged the trial court's discretion to impose an exceptional upward sentence under RCW 9.94A.535(2)(c) but requested a sentence at the top of the standard range instead. When requesting a standard range sentence, defense counsel informed the trial court that White had apparent mental health issues, but that a strategic decision was made to forgo a diminished capacity defense, explaining that White chose instead to argue that he did not start the fires. As a result, evidence of his mental health diagnoses was not introduced at trial.

The State and defense counsel stipulated that White was a "[m]entally ill person[]" as defined under former RCW 71.24.025(27) (2016) and that his mental illness "influenced" his offenses. Verbatim Report of Proceedings (VRP) (Apr. 16, 2018) at 16-17. The trial court agreed with the State's recommended exceptional 180-month sentence and entered findings and conclusions in support of the exceptional sentence.

---

[1] The legislature amended RCW 9.94A.535 in 2019. Because the relevant language has not changed, we cite to the current version of this statute.

[2] White was simultaneously sentenced for one count of second degree attempted burglary under a different cause number.

The trial court also said that it intended to impose only mandatory legal financial obligations; it imposed a $100 DNA collection fee and a $200 criminal filing fee. White appeals from his convictions and sentence.

ANALYSIS

I. IDENTIFICATION TESTIMONY

White contends that Nostrant's testimony identifying him as the person in the security video recorded earlier in the day of the June fire violated due process. White relies on cases addressing the admissibility of a witness's out-of-court identification of a suspect through a police-led identification procedure, like a line up or photo array. Br. of Appellant at 26-33 (citing *State v. Vickers*, 148 Wn.2d 91, 59 P.3d 58 (2002); *State v. Sanchez*, 171 Wn. App. 518, 288 P.3d 351 (2012); *State v. Collins*, 152 Wn. App. 429, 219 P.3d 463 (2009)). White's reliance on these cases is misplaced.

Courts have frequently recognized the fallibility of eyewitness identifications. *See, e.g.*, *Perry v. New Hampshire*, 565 U.S. 228, 245, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012). But "without the taint of improper state conduct," that fallibility does not "warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the [factfinder] to assess its creditworthiness." *Id.* A defendant has the burden of showing that law enforcement employed an impermissibly suggestive identification procedure to establish a due process violation. *Vickers*, 148 Wn.2d at 118; *see also Sanchez*, 171 Wn. App. at 573 ("[F]or the *exclusion* of eyewitness identification to be required by the due process clause, the unnecessarily suggestive circumstances of the identification *must have been arranged by law enforcement*.") (first emphasis in original) (second emphasis added).

Nostrant did not identify White through a police-led identification procedure. He testified that he knew White and recognized him as the person in the videos, in part by comparing the two videos that his own security camera captured on the same day in June 2017. Because Nostrant did not identify White through any police-led identification procedure, the cases White relies upon are distinguishable.

Moreover, even where police are involved in the identification procedure, the same reliability concerns are not present when the witness identifies someone who was previously known to them. *Collins*, 152 Wn. App. at 435-36. Here, Nostrant testified that he knew and recognized White. Although White disputes Nostrant's familiarity with him, evidence at trial showed that White frequently went to his mother's home, which was located next to Nostrant's home, and Nostrant testified that the victim had told him that White was her son. The trial court found Nostrant to be credible. White's due process claim fails for this reason as well. Because White does not present any other argument regarding the admission of Nostrant's identification testimony, we do not further address the issue.

## II. OPINION TESTIMONY

White contends for the first time on appeal that his mother provided impermissible opinion testimony about his guilt when she said that the person on the June and October videos resembled him based on his posture and gait. We disagree.

In general, we will not consider an issue raised for the first time on appeal unless it involves a manifest error affecting a constitutional right. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007); RAP 2.5(a). The defendant must show that the constitutional error actually affected their rights at trial, thereby demonstrating the actual prejudice that renders an error "'manifest'"

and allows review. *Kirkman*, 159 Wn.2d at 926-27 (quoting *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995)).

On appeal, a party may only assign evidentiary error based on the specific ground of the objection made at trial. *See, e.g.*, *State v. Smith*, 155 Wn.2d 496, 501, 120 P.3d 559 (2005) (foundation objection did not preserve hearsay argument for appeal); *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985) ("A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial."). We adopt a strict approach to issue preservation because trial counsel's failure to object denies the trial court of the opportunity to correct the error and avoid a retrial. *Kirkman*, 159 Wn.2d at 935.

Here, defense counsel objected to the victim's testimony on foundational grounds but did not assert that the victim's testimony was an impermissible opinion of White's guilt. Because the basis for White's objection at trial is different from the objection he now raises on appeal, he cannot raise this claim on appeal unless he demonstrates a manifest constitutional error.

"'Generally, no witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant; such testimony is unfairly prejudicial to the defendant because it invad[es] the exclusive province of the [factfinder].'" *State v. King*, 167 Wn.2d 324, 331, 219 P.3d 642 (2009) (internal quotation marks omitted) (first alteration in original) (quoting *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001)). But "'[t]he fact that an opinion encompassing ultimate factual issues *supports* the conclusion that the defendant is guilty does not make the testimony an improper opinion of guilt.'" *State v. Hayward*, 152 Wn. App. 632, 649, 217 P.3d 354 (2009) (quoting *City of Seattle v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993)).

To show manifest error based on a witness's impermissible opinion testimony of guilt, the defendant must show that the witness made "an explicit or almost explicit" statement expressing their opinion of the defendant's guilt. *Kirkman*, 159 Wn.2d at 936-37. Whether testimony constitutes an impermissible opinion on guilt or a permissible opinion embracing an "ultimate issue" will generally depend on the specific circumstances of each case, including the type of witness involved, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact. *Heatley*, 70 Wn. App. at 578. Testimony that is not a direct comment on the defendant's guilt, is otherwise helpful to the factfinder, and is based on inferences from the evidence is not improper opinion testimony. *Heatley*, 70 Wn. App. at 579.

Here, White's mother testified that she was familiar with White's appearance, posture, and gait. While viewing the video exhibit of the June fire, she said that the person in the video strongly resembled White based on the way the person walked. It is clear that this testimony did not constitute an explicit or nearly explicit statement expressing her opinion of White's guilt. White's mother did not opine that the person on the video was White, nor did she opine that the White was guilty of the crimes charged. Instead, she merely said that the person on the video resembled White because they both shared a similar gait. This testimony was helpful to the trier of fact. And although the video provided strong evidence that the person in the videos caused both fires, it was not conclusive on this issue. Because the challenged testimony did not contain an explicit or nearly explicit opinion of White's guilt, White cannot show a manifest error allowing him to raise this issue for the first time on appeal.

III. SUFFICIENCY OF THE EVIDENCE

Next, White contends that the State failed to present sufficient evidence to support his first degree arson convictions. We disagree.

Due process requires that the State prove beyond a reasonable doubt every element of a charged crime. *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015). When evaluating the sufficiency of evidence in support of a conviction, we view all the evidence in the light most favorable to the State. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). We do not consider circumstantial evidence to be any less reliable than direct evidence. *State v. Smith*, 185 Wn. App. 945, 957, 344 P.3d 1244 (2015).

"When reviewing the sufficiency of evidence in support of a conviction following a bench trial, we determine whether substantial evidence supports the challenged findings of fact and whether the findings support the trial court's conclusions of law." *Id.* at 956. Substantial evidence is evidence that is sufficient to persuade a fair-minded, rational person that the findings are true. *Id.* The party challenging a finding bears the burden of demonstrating that the finding is not supported by substantial evidence. *Id.* at 957. We treat unchallenged findings of fact as verities on appeal. *State v. Goggin*, 185 Wn. App. 59, 67, 339 P.3d 983 (2014).

To convict White of first degree arson as charged here, the State had to present evidence sufficient to prove beyond a reasonable doubt that he (1) knowingly and maliciously (2) caused a fire or explosion (3) that damaged a dwelling. RCW 9A.48.020(1)(b). White argues that the State did not present any evidence that he caused the June and October fires at his mother's home because the fire investigator was not able to determine an ignition source for either fire. In support of this argument, White assigns error to the trial court's findings of fact 11 (finding that White

10

intentionally started the June fire), 12 (finding that White intentionally started the October fire), and 13 (finding that White intentionally started fires in willful disregard of the victim's rights).

Substantial evidence supports these findings, which in turn support the trial court's conclusions that White acted knowingly when starting the fires and that he was guilty of both charges of first degree arson. White appears in the June security video approaching his mother's house and then running away from the house minutes later. Immediately after, the house begins to burn. White again appears in the October security video approaching his mother's house carrying something under his arm. Minutes later, White leaves the area no longer carrying anything under his arm. Then the house begins to burn. Malizia testified that, after viewing the October video showing the fire, he concluded that the fire was intentionally set using an accelerant. Taken together, and viewed in a light most favorable to the State, any trier of fact could reasonably infer that the person in the security videos intentionally started both fires and that White was the person in the videos. Accordingly, White's sufficiency claim fails.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

White contends that his defense counsel was ineffective because he did not pursue a diminished capacity defense and he did not request an exceptional mitigated sentence based on White's mental condition at the time of the offenses. On both contentions, we disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel. To demonstrate ineffective assistance, the defendant must show both deficient performance and resulting prejudice. *McFarland*, 127 Wn.2d at 334-35. Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d

1260 (2011). Prejudice ensues if there is a reasonable probability that the result of the proceeding would have differed had counsel not performed deficiently. *McFarland*, 127 Wn.2d at 335. We strongly presume that counsel was effective, and the defendant bears the burden of demonstrating the absence of a strategic reason for the challenged conduct. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

A.    Diminished Capacity Defense

"A diminished capacity defense requires evidence of a mental condition [that] prevents the defendant from forming the requisite [mental state] necessary to commit the crime charged." *State v. Tilton*, 149 Wn.2d 775, 784, 72 P.3d 735 (2003); *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001). Diminished capacity is not a true affirmative defense, but an argument that a specific element of the offense—the defendant's mental state—has not been proved. *State v. Gough*, 53 Wn. App. 619, 622, 768 P.2d 1028 (1989).

A defendant is entitled to a diminished capacity instruction only if (1) the crime charged includes a particular mental state as an element, (2) the defendant presents evidence of a mental condition, and (3) expert testimony logically and reasonably connects the defendant's alleged mental condition with the asserted inability to form the mental state required for the crime charged. *Atsbeha*, 142 Wn.2d at 914. The testimony of an expert witness is necessary to present a diminished capacity defense. *State v. Stumpf*, 64 Wn. App. 522, 526, 827 P.2d 294 (1992).

Here, there was no expert testimony presented supporting a diminished capacity defense. White argues that defense counsel was ineffective for failing to request a mental health evaluation and to secure an expert witness to support the defense. But the record shows that White himself made the decision to forgo a diminished capacity defense and, instead, pursue a general denial

defense that he did not cause the fires at the victim's house. Because White chose not to pursue a diminished capacity defense, he cannot show on this record that his defense counsel was ineffective on this basis.

B.      Exceptional Mitigated Sentence

Next, White contends that his defense counsel was ineffective for failing to request an exceptional mitigated sentence based on his mental condition. We disagree.

RCW 9.94A.535(1)(e) provides a sentencing court with discretion to impose an exceptional sentence below the standard range if it finds that "[t]he defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired." For RCW 9.94A.535(1)(e) to apply, "[t]he record must show *both* the existence of the mental condition *and* the connection between the condition and significant impairment of the defendant's ability to appreciate the wrongfulness of his conduct." *State v. Hart*, 188 Wn. App. 453, 464, 353 P.3d 253 (2015) (emphasis added).

Here, the parties stipulated that White had a mental condition that influenced his offenses, but there is no evidence in the record that his mental condition prevented him from appreciating the wrongfulness of his conduct or from being able to conform his conduct to the law. Accordingly, the evidence in the record did not support a request for an exceptional sentence under RCW 9.94A.535(1)(e). White has shown neither deficient performance nor resulting prejudice on this record. *See McFarland*, 127 Wn.2d at 338.

## V. LEGAL FINANCIAL OBLIGATIONS

White asks that we direct the trial court to strike the $200 criminal filing fee and the $100 DNA collection fee from his sentence.

Recent legislation prohibits trial courts from imposing criminal filing fees on indigent defendants and prohibits trial courts from imposing a DNA collection fee on defendants who have already had their DNA collected as the result of a prior conviction. RCW 36.18.020(2)(h); RCW 43.43.7541. The recent legislation applies prospectively to defendants like White, whose cases were pending on appellate review and were not yet final when the legislation was enacted. *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

The trial court found White indigent. Thus, the criminal filing fee should be stricken. Although the record shows that White has previously been convicted of felonies, which would have required him to provide a biological sample for DNA testing under RCW 43.43.7541, the record does not definitively show whether the State has previously collected his DNA. Therefore, we remand to the trial court to strike the criminal filing fee and to strike the DNA collection fee unless the State demonstrates that White's DNA has not been previously collected. *See State v. Houck*, 9 Wn. App. 2d 636, 446 P.3d 646 (2019) (a defendant's prior felony conviction gives rise to the presumption that the defendant's DNA has previously been collected, which the State bears the burden of rebutting).

## VI. STATEMENT OF ADDITIONAL GROUNDS

In his statement of additional grounds for review, White contends that he should have been given a mental health evaluation before trial and that he was unable to understand the trial proceedings because the Grays Harbor County Jail denied him necessary medications while he was awaiting trial.

No. 51776-1-II

Regarding his first contention, the record shows that White declined to pursue a diminished capacity defense that would have necessitated a mental health evaluation. Accordingly, on this record, he cannot show any error on this basis.

Regarding his contention that the jail denied him access to medication necessary to facilitate his understand the proceedings against him, the record is devoid of any evidence supporting this factual allegation. If White wishes a reviewing court to consider matters outside the record, he must file a personal restraint petition. *McFarland*, 127 Wn.2d at 338.

CONCLUSION

We affirm White's convictions but remand to the trial court to strike the criminal filing fee and to reconsider whether to impose the DNA collection fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Sutton, P.J.

Cruser, J.

15